274 F.2d 414
 Ralph SMEED, Harold Doan, Albert Black, B. W. Avers and Charles Sewell, a Partnership Doing Business as the Boise Valley Livestock Commission Company, Appellant,
v.
George CARPENTER and National Surety Corporation, Appellees.
 No. 16441.
 United States Court of Appeals Ninth Circuit.
 January 12, 1960.
 
 Smith & Miller, Lawrence N. Smith, Caldwell, Idaho, for appellant.
 Clemons, Skiles & Green, C. Stanley Skiles, Boise, Idaho, for appellee.
 Before ORR, POPE and MERRILL, Circuit Judges.
 ORR, Circuit Judge.
 
 
 1
 This action is concerned with transactions arising out of the buying and selling of livestock. The livestock business reached such a magnitude that Congress, sensing its vital concern to the country, saw fit to enact regulatory legislation known as the Packers and Stockyards Act, 1921, 7 U.S.C.A. § 181, and placed in the hands of the Secretary of Agriculture the duty of carrying out the mandates of said act. "The object to be secured by the act is the free and unburdened flow of livestock from the ranges and farms of the West and the Southwest through the great stockyards and slaughtering centers on the borders of that region, and thence in the form of meat products to the consuming cities of the country in the Middle West and East, or, still as livestock, to the feeding places and fattening farms in the Middle West or East for further preparation for the market." Stafford v. Wallace, 1922, 258 U.S. 495, 514, 42 S.Ct. 397, 401, 66 L.Ed. 735.
 
 
 2
 In order to carry out the purposes of the act, the Secretary of Agriculture has promulgated regulations governing the operation of stockyards. To insure the free and unburdened flow of livestock through the nation's yards, operators thereof are required to set up a custodial fund into which the purchase price received from buyers is placed and from which sellers are paid. Reg. 201.42, 9 C.F.R. § 201.42. It is also required under the regulations that a dealer, as defined in the act, 7 U.S.C.A. § 201, post a bond with prescribed conditions. Reg. 201.29, 9 C.F.R. § 201.29. Appellee Carpenter was at all relevant times such a dealer and posted the required bond in the sum of $8,000 with appellee National Surety Company as surety. The relevant terms of said bond read as follows:
 
 
 3
 "Now, Therefore, the condition of this bond is such that * * *
 
 
 4
 "If the said Principal shall pay, when due, to the person or persons entitled thereto the purchase price for all livestock purchased by said Principal at a public stockyards, as defined in the Act of Congress known as the Packers and Stockyards Act, 1921, as amended;
 
 
 5
 "Then this bond shall be null and void, otherwise to remain in full force and virtue.
 
 
 6
 "Any person damaged by the breach of any condition hereof may maintain an action on this bond in his own name to recover his damages, after first giving written notice to the trustee herein * * *."
 
 
 7
 Alleging a breach of performance on the part of Carpenter, appellant Boise Valley Livestock Commission Company, operators of a licensed public stockyard as defined in the act, 7 U.S.C.A. § 202, instituted suit against Carpenter and his surety in the sum of $7,254.47. The trial court gave judgment against Carpenter but denied judgment against the surety on the ground that certain transactions between appellant and Carpenter hereafter described were loans prohibited by Regulation 201.61(a), 9 C.F.R. § 201.61 (a), and not within the terms of the obligation which the surety had assumed. It will be noted that the bond is conditioned that Carpenter "pay, when due, to the person or persons entitled thereto the purchase price for all livestock purchased * * * at a public stockyards, as defined in the Act of Congress known as the Packers and Stockyards Act, 1921, as amended." We find no contradiction of the fact that the stockyard operated by appellant came within the definition of the act (7 U.S.C.A. § 202).
 
 
 8
 As we understand the procedure followed at the yard, sales are made through a sales ring. Cattle are put up for sale in the ring and bids are taken. When a sale is made, the cattle so purchased are weighed and a ticket recording the sale is carried on a conveyor belt into the office. There a clerk makes out a purchase sheet in triplicate listing the names of the purchaser and consignor of the cattle which had been sold, the number of head, and the weight. A yellow copy of the purchase sheet is filed in the office, a pink one is given to the brand inspector, and a white one is given to the purchaser when he pays for the cattle he has purchased. When the purchase sheet is completed, it is passed on to another clerk who writes out a sales sheet to which she attaches a check for the purchase price of the cattle, less commission, brand inspection fee, and the cost of feed, if any. The consignors of the cattle which have been sold in the ring are entitled to receive this sales sheet and attached check immediately without waiting for the purchasers to make payment upon completing all their purchases through the ring. The checks the consignors receive are drawn upon the custodial account heretofore mentioned. Regulation 201.42 provides that this account is to be drawn upon only for payment to the market agency of the sums due it for its services and for other lawful charges made by it against the consignment of the cattle, and for the payment of the net proceeds to the consignors of the cattle sold. 9 C.F.R. § 201.42. Regulation 201.43 requires prompt payment of the proceeds received from the sale of the cattle to the consignors of the cattle, such payment to be "* * * before the close of the next business day following the sale * * *" 9 C.F.R. § 201.43. Since purchasers are required to pay within 24 hours, the fund is normally maintained at a sufficient level to cover all checks drawn against it. If the account became overdrawn, however, the custodian would be required to replenish it. This procedure is designed to and does facilitate the free and unburdened flow of livestock through the yards.
 
 
 9
 During the course of the afternoon of May 2, 1957, appellee Carpenter purchased 407 head of cattle through appellant's sales ring, the sales being handled in the usual manner. Upon completing all his purchases, and not before then, he notified appellant that until he could find a buyer to whom they could be resold, he would be unable to pay for the cattle. Pursuant to instructions received from Carpenter, the 407 head of cattle were placed in appellant's feed yard where they were to be given an agreed upon ration of feed and held until Carpenter could resell them. On May 14, 1957, 266 head of cattle were shipped to a buyer procured by Carpenter and appellant received $65,177.75 which was credited to Carpenter's account. Then on May 31, 1959, the remaining cattle were resold through the sales ring and the proceeds similarly credited to Carpenter's account. The market price of cattle declined continually following Carpenter's purchase so that they brought less on resale than Carpenter had paid for them. After crediting the resale proceeds to Carpenter's account, therefore, a balance of $7,254.47 remained due and payable to the custodial fund and appellant.
 
 
 10
 We think the facts above stated present a situation wherein the sale of the 407 head of cattle comes clearly within the terms of the bond. They were sold pursuant to customary business practices and regulations of the Secretary of Agriculture at a public stockyard as defined in the act, and appellant as custodian of the fund out of which the consignors of cattle were paid is the person entitled to payment. We are unable to see wherein the transaction could have in any sense been one of a loan. The consignors were paid out of the custodial account in the regular course of business. Carpenter thereby became indebted to that fund. He was unable to pay. The burden of payment then shifted to the surety. The finding of the trial court that the money paid the consignor was a loan is clearly erroneous. If the surety is not liable under the circumstances here recited, the giving of the required bond would be an idle gesture, because no liability could be incurred unless appellant's practice of paying consignors prior to receipt of payment from purchasers was changed, and such a change is neither required by law nor desirable.
 
 
 11
 In our foregoing determination of liability we have specifically mentioned 407 head of cattle, this for the reason that the purchase of 75 head, known as the Thiel Brothers cattle, is involved in this suit but we think comes within a different category. Appellee Carpenter employed one Russ Freeman on a part time basis to purchase cattle for him. Freeman, acting as Carpenter's agent, purchased 75 head of cattle from Thiel Brothers, Idaho cattle growers, the purchase having been made at a farm owned by them. It was agreed that the cattle would be delivered to appellant's feed yard, there to be weighed and paid for. Upon request of Carpenter, appellant paid to Thiel Brothers the purchase price of the cattle by a check drawn upon its general account, the understanding being that Carpenter would reimburse appellant at the time he paid for the cattle he expected to purchase through the sales ring the same day the advance was made. Freeman was paid his commission out of the custodial fund. Carpenter was unable to repay appellant, so the 75 head of cattle purchased from Thiel Brothers were kept in appellant's feed yard with the 407 head of cattle purchased by Carpenter through the sales ring for which he was also unable to make payment. It thus seems clear that appellant's advance of funds to purchase the Thiel Brothers cattle was not done in its capacity as custodians of the custodial fund. It was a private accommodation extended to Carpenter, and was completely divorced from the operation of a public stockyard as defined in the act (7 U.S.C.A. § 202). Under Idaho law which controls here since the transaction took place in that state, a sale takes place when the property in goods is transferred from the seller to the buyer. Idaho Code § 64-101, subd. 2 (Idaho has adopted the Uniform Sales Act). And section 64-203 of the Idaho Code provides that:
 
 
 12
 "Unless a different intention appears * * *:
 
 
 13
 "Rule 1. Where there is an unconditional contract to sell specific goods, in a deliverable state, the property in the goods passes to the buyer when the contract is made and it is immaterial whether the time of payment, or the time of delivery, or both, be postponed."
 
 
 14
 Here a contract to sell specific goods (cattle) was made at the Thiel Brothers' farm. Of necessity, payment had to be delayed until the cattle were delivered to the yards where they could be weighed. Such a postponement of delivery and payment is immaterial to the question of when title to the cattle passed. Under Idaho law, the sale took place at the Thiel Brothers' farm. This farm is not a public stockyard as defined in the act. Since the terms of the bond cover purchases at public stockyards only, the purchase of the Thiel Brothers cattle was not within the terms of the bond and appellee National Surety Company is not liable for Carpenter's failure to pay for such cattle or for any damages resulting to appellant by reason of such failure. The case of Hartford Accident & Indemnity Company v. Baldwin, 8 Cir., 1958, 262 F.2d 202, upon which appellant relies, differs from the instant case in that there the parties failed to reach any agreement at the farms, a meeting of the minds having taken place only after negotiations at the public stockyard.
 
 
 15
 So, to sum up, we hold that the liability of the surety applies to purchases made by Carpenter through the sales ring, viz., the 407 head of cattle, but that no liability exists as to the 75 head purchased from Thiel Brothers. It is impossible to determine from the record the amount claimed as the balance due appellant because of the purchase price, commission, brand inspection fee and feed bill charged against the 407 head of cattle from that charged against the 75 head purchased from Thiel Brothers.
 
 
 16
 The regulations promulgated under the Packers and Stockyards Act require that a trustee be appointed in whose favor all bonds furnished under the act shall run. Reg. 201.32, 9 C.F.R. § 201.32. The bond furnished in the instant case provided that notice of suit be given said trustee before the action is begun. After judgment was entered in appellee's favor, appellee requested the trial court to make an additional finding that notice of this suit had not been given to the trustee. The request was denied. The giving of such notice would at most have been a mere formality because no control of whether or not suit could be brought vested in the trustee either by the terms of the bond or the statute. No notice requirement is contained in the regulations. They provide that any person damaged by the failure of the principal, under the bond, to perform the conditions of the bond shall have the absolute right to sue thereon in his own name. Reg. 201.33, 9 C.F.R. § 201.33. The failure to give notice could have been raised under the Federal Rules of Civil Procedure either by motion or answer. Rule 12(b), 28 U.S.C.A. Appellee claims that it did raise the defense by the fourth defense in its answer by the allegation "That the complaint fails to state a claim upon which relief may be granted," which is the language suggested by Form 20 accompanying the Federal Rules of Civil Procedure. The statement of a defense in such general terms suffices where "a single, definite, and certain question" is thereby presented. Kenney v. Fox, D.C.W.D.Mich.1955, 132 F.Supp. 305, 307, affirmed 6 Cir., 1956, 232 F.2d 288. But here the alleged defect in the complaint was not apparent and the defense should have been supported with sufficient particularity to apprise the court of the defect. See Munson Line, Inc. v. Green, D.C.S.D.N.Y.1947, 6 F.R.D. 470; Trammell v. Fidelity & Casualty Co. of New York, D.C.E.D.S.C.1942, 45 F.Supp. 366; Advertisers Exchange, Inc. v. Bayless Drug Store, Inc., D.C.D.N.J.1942, 3 F.R. D. 178. The failure of appellee to bring to the trial court's attention the particulars upon which it relied in its assertion that the complaint failed to state a claim upon which relief could be granted constitutes a waiver of its right to rely on that defense. Rule 12(h) Fed.Rules Civ. Proc. See Black, Sivalls & Bryson, Inc. v. Shondell, 8 Cir., 1949, 174 F.2d 587. Compare Meisenheimer v. Kellogg, 1900, 106 Wis. 30, 81 N.W. 1033 (statutory notice requirement waived unless raised prior to appeal). Performance of a condition which is not a substantial part of the consideration underlying the promisor's obligation may be waived. Corbin, Contracts (1950) § 760. The requirement of giving notice being a condition in that category, we conclude that the complaint states a claim upon which relief may be granted.
 
 
 17
 The judgment of the trial court as to non-liability of appellee National Surety Company as it relates to the 407 head of cattle purchased through appellant's sales ring is reversed. As to the non-liability of the surety in the purchase of the Thiel Brothers cattle it is affirmed, and the judgment against appellee Carpenter is affirmed.
 
 
 18
 Reversed and remanded for such further proceedings as the trial court may deem necessary to determine the liability, if any, of National Surety Company under the provisions of the bond, such proceedings to be consistent with the views expressed in this opinion.