Eugene N. FRANCIS, Respondent,

v.

NEW AMSTERDAM CASUALTY COMPA-NY, a Corporation, Appellant.

No. 24424.

Kansas City Court of Appeals.

Missouri.

Oct. 3, 1966.

Karl F. Schmidt, Kansas City, Ronald Reed, St. Joseph, Morrison, Hecker, Cozad & Morrison, Kansas City, Reed & Reed, St. Joseph, of counsel, for appellant.

R. A. Brown, St. Joseph, Brown, Douglas & Brown, St. Joseph, of counsel, for respondent.

HOWARD, Judge.

This is a suit on a bond given pursuant to the requirements of the Packers and Stockyards Act, 1921, as amended, 7 U.S.C.A. § 181 et seq., and particularly Section 204 and the rules and regulations promulgated pursuant thereto by the United States Secretary of Agriculture. See Sections 201.29 and 201.31 of these regulations. Trial without a jury in the Circuit Court of Buchanan County, Missouri, resulted in a judgment for plaintiff in the sum of $8,568.-09. This court thus has jurisdiction of this appeal. We shall refer to the parties as they appeared below.

The principal in the bond was George Umphlet. He was in business at the St. Joseph Stockyards, both dealing for himself and acting as a broker or clearing agency for the dealings of others. He did not buy or sell for others on a commission basis, but bought and sold only for himself, principally, if not exclusively, sheep. In his capacity as a clearing agency for other dealers he paid for all of the livestock purchased by them at the St. Joseph Stockyards. He also received the proceeds of all sales made by these other dealers. For his services he charged a fee of fifty cents per head purchased; no fee was charged on sales.

The dealers who cleared through Umphlet, did not buy or sell for others on a commission basis. They only bought and sold on their own account, and sought to buy at a low price and sell at a higher price, thus making a profit on the spread between the price at which the cattle were bought and sold. The dealers with whom we are concerned herein dealt only in cattle and they were all successful dealers, making a profit.

The St. Joseph Stockyards was a posted stockyard under the Packers and Stockyards Act, 1921, as amended. It was thus required to comply with all the provisions of such act, and all dealers and market agencies operating at the stockyards were required to give bond. If the dealers did not give bond themselves, it was necessary that they clear their transactions through some one else who had given a bond. Umphlet gave such a bond, which was issued by the defendant, New Amsterdam Casualty Company, June 14, 1961. On the same date a rider was issued naming the dealers who were to clear their dealings through him. It is the claim of eight of these dealers against Umphlet, for which plaintiff brought this suit. Umphlet required each dealer to deposit a certain amount of money with him (Umphlet) before the dealer was permitted to clear his trading through Umphlet. This requirement was roughly $20.00 for each head bought by the dealer, although it might be less for a dealer who was buying stocker and feeder cattle, or calves, or light weight cattle. This deposit is referred to as "margin money". Thus if the dealer desired to purchase up to ten head of cattle at a time, he must have on deposit with Umphlet at least $200.00 in margin money. If he desired to buy a greater number of cattle he was required to increase his deposit of margin money.

In his operations Umphlet deposited all his money in one bank account at the Drovers and Merchants Bank in St. Joseph, Missouri. This included Umphlet's own personal funds and the margin money deposited with him by the various dealers. When any dealer bought cattle, Umphlet paid for them with a check drawn on this one bank account. When cattle were sold, Umphlet received the proceeds, which went into this one bank account. From this bank account, Umphlet also paid expense items incurred by the various dealers in connection with their trading. He also paid personal expenses of the various dealers, when requested to do so. The dealers also drew cash from Umphlet. One dealer witness expressed it as "just like pay day." Mr. Umphlet maintained a line of credit at the Drovers and Merchants Bank. When the total purchases of Umphlet and the dealers required more money than he had in this one bank account, he would borrow sufficient money from the bank to cover

the cost of the cattle purchased, and when the cattle were sold, and the proceeds received by Umphlet, the loan would be paid off. This borrowing and paying off loans was a daily occurrence. Shortly before closing time each day, the bank would advise Umphlet of his position, and he would borrow whatever amount of money was necessary.

Umphlet kept several different books of account. One ledger showed the margin account of each dealer, another showed in detail the trading account of each dealer. For each transaction this showed the number of head of cattle purchased, from whom purchased, the weight of the animals, the price at which they were purchased, and the total amount of the purchase. It also showed the expenses for brokerage, feed, yardage, commissions and incidentals and cash withdrawn from the account by the dealer. On the other side of this ledger was shown the number of head of cattle sold, to whom sold, the weight of the animals sold, the unit price and the gross price of the sale. This ledger also contained a running account showing the number of animals bought or sold, the number on hand, and a running balance of the dealer's trading account. If the dealer had a loss in his tradings, he would be required to transfer credit from his margin account to his trading account, to make up such loss. If, on the other hand, the dealer showed a profit, and desired to expand his trading operations, he could transfer credit from his trading account to his margin account and thereby be qualified to purchase a larger number of animals and clear such purchase through Umphlet. Likewise, if his margin account became depleted, or if he desired to increase the scope of his operations, and did not have profit in his trading account, he would be required to deposit additional cash with Mr. Umphlet to maintain or increase his margin account.

Late in January, 1963, the bank refused to extend further credit to Umphlet and checks on his one bank account for the purchase of cattle, to the amount of several thousand dollars, were dishonored. This resulted in notice and cancellation of his bond, effective about February 18, 1963. When the checks were dishonored, Umphlet requested the dealers clearing through him to sell all the cattle they had on hand. This was done in the next three trading days and all amounts due for the purchase of cattle were paid. This hurried sale of all cattle on hand resulted in a sale on a disadvantageous market. When the books were closed out, each dealer showed a debit balance in his trading account, which in each instance was less than the amount standing to his credit in his margin account. This debit in the trading account was setoff against the credit in the margin account and each dealer has money owing to him in the amount of the final credit balance in his margin account. Umphlet was unable to pay these balances in the various margin accounts, and although demand therefor was made by each dealer, these amounts have not been paid. This suit was brought by the plaintiff Francis to collect the amounts thus due to the various dealers as specifically authorized by both the bond itself and the regulations.

The bond is conditioned, as to the activities of Umphlet as a clearing agency, as follows:

"(4) If the said Principal, acting in the capacity of broker or clearing agency, and thereby being responsible for the financial obligations of other registrants, viz: [names inserted by rider] shall (a) pay, when due, to the person or persons entitled thereto the purchase price for all live stock purchased by such other registrants; (b) safely keep and properly disburse all funds coming into the hands of said Principal for the purpose of making such purchases and (c) safely keep, and faithfully and promptly account for and pay to the owners or their duly authorized agents the proceeds of sales of all live stock received for sale on a commission basis by such other registrants for whom said Principal acts as broker or clearing agency;"

Umphlet admitted that he owed the dealers the amounts shown on his books and was unable to pay them. The defendant surety refused to pay and on this appeal contends that it is not liable to the plaintiff, who sues on behalf of these dealers, for three reasons. It first contends that the dealers are not within the class protected by the bond, and that therefore any obligation of Umphlet to the dealers is not covered by the bond. It argues that the purpose of the Packers and Stockyards Act was to protect livestock producers and other third persons from packers and others who operated at the stockyards and thus promote the general welfare and protect the flow of livestock in commerce. It further contends that it was not the purpose of the act to protect the dealers from defalcation by Umphlet, and that the bond can be no broader than this purpose of the act under which the bond was required. We can not agree with these contentions.

■ Undoubtedly the broad purposes of the act were to promote the general welfare by protecting the flow of livestock in commerce, and those interested therein, from the discriminatory and monopolistic practices found to have existed at the stockyards throughout the country. However, nothing in the act limits its protection or the application of its provisions to those who are strangers to the stockyards or to those who are producers of livestock. In support of its contentions the defendant cites general statements found in Smeed v. Carpenter, CA9, 274 F.2d 414 and United States v. Wehrheim, CA8, 332 F.2d 469, that the purpose of the act was to secure the free and unburdened flow of livestock from the producer to the consumer, to protect livestock producers and the public and thus promote the general welfare. We find no fault with these general statements or with other similar statements found in such cases as Houfburg v. Kansas City Stock Yards Co. of Maine, Mo., 283 S.W.2d 539 and Bowles

v. Albert Glauser Inc., D.C.E.D.Mo., 61 F.Supp. 428, where the court emphasized the purpose of the act to remedy abuses of unfair, monopolistic and discriminatory practices and to maintain open and free competition. All of these and other statements of purpose are couched in very general language and none of them purport to be definitive or all inclusive. In each case the court referred only to that aspect of the purposes underlying this statutory enactment which was pertinent to the fact situation before it. No case has been cited by counsel or found by us which purports to limit the scope of the act or the bonds given thereunder, so as to exclude these dealers from the obligations, benefits and protection thereof. The cases heretofore cited certainly do not do so and do not even tend in that direction. The act clearly governs the conduct of dealers and market agencies in their dealings with each other as well as in their dealings with livestock producers and members of the general public and we have no basis for excluding these dealers from the class of persons protected by the bond given pursuant to the requirement of the act and the regulations.

■ Furthermore, the contention of defendant that the coverage of the bond must be limited to the purposes of the act, regardless of the language used in the bond, is not persuasive. The Texas Court of Civil Appeals in Fireman's Fund Insurance Company v. Abilene Livestock Auction Company, 391 S.W.2d 147, specifically decided to the contrary. This case pointed out the general principle that while the bond given pursuant to the act must be as broad as the act requires, the coverage granted by the language used in the bond may be broader than that required in the statute, and that the liability of the surety is as broad as the obligation created by the language used.

■ Thus we are left to a consideration of the language contained in the bond here in question to determine whether or

not the dealers, whose claims are here to be determined, are covered by the provisions of the bond. As to the activities of Umphlet in operating as a clearing agency or broker, the bond covers payment of the purchase price for all livestock "purchased by such other registrants". This last quoted language refers specifically to these dealers who are named in the rider. The bond is then conditioned that the principal shall "safely keep and properly disburse all funds coming into the hands of said principal for the purpose of making *such purchases.*" The words we have italicized clearly refer to purchases made by such other registrants, i. e., the dealers here being considered. Our question, therefore, is whether or not the claims of these registrants is for money which came into the hands of the principal, Umphlet, for the purpose of paying for purchases made by these dealers. We can only conclude that it is. The deposit of the margin money with Umphlet was an absolute prerequisite to such purchases. The dealer could not buy cattle at the St. Joseph Stockyards and have his purchases cleared through Umphlet unless and until he had deposited such margin money with Umphlet. Furthermore, the number of cattle that any dealer could buy was specifically limited by the amount of margin money on deposit with Umphlet. What did Umphlet do with this money? He put it in his one and only bank account. He paid for all purchases of cattle out of this bank account. The bank account was often completely depleted and it was necessary to borrow money to replenish it. As to the margin money deposited by any one dealer, it was paid out for the purchase of cattle, came back into the hands of Umphlet, and into his bank account, when such cattle were sold, and was paid out again for the next purchase of cattle, many times during the period covered by this bond. This is true for all the margin money in the aggregate as well as for the margin money of any one dealer, individually. Thus we can only conclude that the money was given to Umphlet for the purpose of making such purchases and that the money was in fact used by Umphlet for this purpose, time and time again.

We reach this conclusion after giving full consideration to the matter of the payment of expenses, etc., as urged by defendant. In addition to paying the purchase price of cattle, Umphlet also paid expenses incident to the business operations of the dealers. He also, from time to time, paid personal expenses of the individual dealers, and the dealers regularly drew down cash from their trading accounts. These expenses were recorded in detail in the ledger containing the trading account of each dealer. However, that did not affect the dealer's margin account. During the time here in question each dealer drew in cash from the profits in his trading account, several times the amount of margin he had on deposit. We must not let the accounting entries obscure the facts as to what was actually done with the money. The margin money was deposited with Umphlet, as a condition precedent to the dealer being able to trade at the St. Joseph Stockyards and clear his dealings through Umphlet. Thus, when the dealer bought cattle it was, as to him, a partly cash and partly credit transaction. The purchase price of the cattle was paid for with his margin money, as far as it would go, and the balance was loaned to the dealer by Umphlet. Umphlet received repayment of his loan when the cattle were sold, and, likewise, the margin money came back to Umphlet's hands, plus any profit or less any loss.

Counsel has cited no case from Missouri construing bonds given under the Packers and Stockyards Act and our own research has revealed none. No cases from other jurisdictions have been found dealing with the factual situation here presented. However, there are cases from other jurisdictions construing other conditions of bonds given under the Packers and Stockyards

Act, and they do throw some light on our problem. In Smeed v. Carpenter, CA9, 274 F.2d 414, the defendant purchased cattle at a market covered by the act. The market paid the seller of the cattle out of a separate fund maintained for that purpose and thereafter found that the defendant was unable to pay for the cattle he had purchased. It was held that the surety on the defendant's dealers' bond was liable for the price of the cattle. It should be noted that this liability on the bond was not to the producer or some other third party, but to the market agency. In Fireman's Fund Insurance Co. v. Abilene Livestock Auction Company, Tex.Civ. App., 391 S.W.2d 147, a bonded dealer, registered at one stockyard, purchased cattle at another stockyard, which was also under the Packer and Stockyard Act. He failed to pay for the cattle he purchased. The court held that the surety on the dealer's bond was liable for the price of the cattle so purchased, even though the purchase was made at a stockyard other than the one at which the dealer was registered. A similar result was reached by the Federal District Court for the Eastern District of Arkansas in Lewis v. Goldsborough, 234 F.Supp. 524. Here the dealer, who was registered at one stockyard, bought cattle at another stockyard, and gave his personal check for the purchase price. The check was dishonored and it was held that the surety on the bond of the broker through whom he cleared his transactions at the stockyards where he was registered, was liable for his purchase at another stockyard, even though the dealer did not attempt to clear such purchase through the broker. See also Hartford Accident and Indemnity Company v. Baldwin, CA8, 262 F.2d 202. These cases disclose that the courts which have considered the provisions of these stockyard bonds, have given a liberal construction thereto in favor of the persons having claims against the bond. Since we are here dealing with a compensated surety, this liberal construction is in conformity with the law of Missouri that the provisions of the bond will be construed, where construction is necessary, against the surety and in favor of the claimant. We believe that in conformity with the principles laid down in the cases heretofore cited that the dealers who are the actual claimants herein, are within the class protected by the bond and that their margin money was given to Umphlet for the purpose of purchasing cattle.

What we have already said largely disposes of defendant's second contention, which is that the margin money was given to Umphlet as security to protect him against loss occasioned by a drop in the market and was not given for the purpose of purchasing cattle. The two cases cited by defendant in support of this contention considered the problem of whether a margin account represented an actual, bona fide buy and sell transaction or whether it was a gambling transaction wherein the margin money represented a wager that the market would go up or down. In each of these cases, the court held that the transaction represented bona fide purchases and sales and was not a gambling transaction. In the course of these opinions it was pointed out that the money deposited by the customer served to protect the broker from losses occasioned by a fall of the market, and was not a wager. These cases have no applicability to our problem. It is true that the margin money deposited with Umphlet did protect him from losses resulting from a drop in the market. However, that does not change the fact that the money was given and used for the purchase of cattle. This may be compared to the purchase of a house by means of a cash down payment and a mortgage securing a loan for the balance. If the mortgage must be foreclosed and the house sold to repay the loan, the down payment serves to secure the seller against a drop in the real estate market. However, this does not alter the fact that the money given as the down

payment was used for the purchase of the house.

Lastly, defendant contends that much of the margin money for which plaintiff secured judgment below, was deposited with Umphlet prior to the execution of the bond here in question. This bond was issued June 14, 1961. Umphlet had been in business and had been acting as a clearing agency for these dealers for a considerable time prior to this date. Before this bond was issued, Umphlet had a bond written by the Hartford Company. Defendant contends that it can not be liable under this bond for any money deposited with Umphlet prior to the effective date of its bond. It cites no cases which are decisive on this point. However, it was early settled in Missouri law that where there are successive bonds with different sureties on each, liability attaches to the surety on the bond which was in force at the time of the defalcation. See State, to Use of Smith v. Paul's Executor, 21 Mo. 51; State, to Use of Southern Bank of St. Louis v. Atherton, 40 Mo. [209] 210; State, to Use of Pace v. McCormack, 50 Mo. 568. This comports with the general principles of the law of suretyship as set out in 72 C.J.S. Principal and Surety § 110, page 590. It was specifically pointed out in the case of State, to Use of Blacker v. O'Neill, 114 Mo.App. 611, 90 S.W. 410, that in instances of successive bonds, liability did not attach when the funds came into the hands of the principal, but, liability was to be imposed upon the surety on the bond which was in force at the time of the defalcation.

Here the evidence shows that the various dealers made deposits of margin money, from time to time, both prior to and after the effective date of the bond upon which defendant is surety. Umphlet still had and was using all of the margin money shown in the margin accounts at the time this bond came into force. There had been no defalcation prior to the effective date of this bond. Each of the dealer witnesses testified that there was no failure on the part of Umphlet prior to January, 1963. Umphlet testified that everything was all right at the time of the execution of this bond and prior thereto. It was only when the bank refused to extend further credit to Umphlet and the business had to be closed out, that defalcation was made. It as only then that Umphlet failed to return the money in the margin accounts to the individual dealers. We, therefore, conclude that Umphlet's defalcation occurred at a time when the bond on which defendant was surety, was in force.

From the foregoing it follows that the margin money of the various dealers was given to Umphlet for the purpose of making purchases of cattle by the dealers and that Umphlet failed to safely keep and properly disburse such funds; that, consequently the condition of the bond has been breached and defendant is liable therefor.

The judgment of the trial court in favor of plaintiff is affirmed.

All concur.