Julia Prewitt BROWN,
Plaintiff, Appellee,

v.

TRUSTEES OF BOSTON UNIVERSITY,
Defendant, Appellant.

No. 88–1288.

United States Court of Appeals,
First Circuit.

Dec. 1, 1989.

As Amended Dec. 1, 1989.

Order on Denial of Rehearing
Jan. 24, 1990.

**340**

Stanley R. Strauss with whom Charles I. Cohen, Gregory W. Homer, Vedder, Price, Kaufman, Kammholz & Day, Michael B. Rosen, Sandra S. McQuay and Goodwin, Proctor & Hoar were on brief for appellant.

John A. Beach, Thomas G. Eron and Bond, Schoeneck & King on brief for Syracuse University, Amicus Curiae.

Sheldon Elliot Steinbach, General Counsel, Woodley B. Osborne and Hanna, Gaspar, Osborne & Birkel on brief for American Council on Education, Amicus Curiae.

Robert E. Sullivan, John T. Harding, Jr., Jeffrey F. Jones and Palmer & Dodge on brief for Massachusetts Institute of Technology, President and Trustees of Williams College, Boston College, Tufts University, Suffolk University and Adelphi College, Amici Curiae.

Dahlia C. Rudavsky with whom Ellen J. Messing and Shilepsky, Messing & Rudavsky were on brief for appellee.

Beatrice Valdez with whom Charles A. Shanor, Gen. Counsel, Gwendolyn Young Reams, Associate Gen. Counsel, and Lorraine C. Davis, Asst. Gen. Counsel, were on brief for Equal Employment Opportunity Commission, Amicus Curiae.

Mary W. Gray, American University, Ann H. Franke, Counsel, American Association of University Professors, and William Van Alstyne, Duke University School of Law, on brief for the American Association of University Professors, Amicus Curiae.

Before CAMPBELL, Chief Judge, BREYER and TORRUELLA, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

Julia Prewitt Brown, an assistant professor of English at Boston University sued in the Massachusetts Superior Court after she was denied tenure by defendants, the Trustees of Boston University ("University"). The University removed the case to the District Court for the District of Massachusetts. Alleging that she had been refused tenure because of her sex, Professor Brown contended that denying her tenure for that reason violated an anti-discrimination clause in the University's collective bargaining agreement with its faculty. A jury found in her favor on this contract claim; it awarded her $200,000 damages for the breach. Brown also brought claims for the alleged sex-based denial of tenure under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1982), and under the Massachusetts anti-discrimination statute, Mass.Gen.L. ch. 151B, § 4 (1982). Applying to these other claims the finding of sex discrimination made by the jury in the contract action, the district court ordered the University to pay Brown $15,000 in damages for emotional distress, enjoined the University from further sex discrimination against Brown and other faculty members, and ordered the University to grant to Brown the position of Associate Professor with tenure. Boston University appeals from the jury verdict, the award of tenure, and the injunction from further sex discrimination. We affirm the findings of liability and the tenure award, but slightly modify the anti-discrimination injunction.

### I. Background

In the fall of 1974, plaintiff Brown began working at Boston University as an Assistant Professor of English Literature, on the tenure track. Tenure candidates had to teach for six years before being eligible for tenure. During the sixth year the candidate was evaluated in three areas: scholarship, teaching, and service to the university. Excellence had to be demonstrated in two of the three areas.

Brown came up for tenure in the academic year 1979–80. At this time the ground rules for tenure review were spelled out in a recently negotiated collective bargaining agreement ("Agreement" or "Contract") between the Boston Univer-

sity Chapter of the American Association of University Professors ("Chapter") and Boston University. The process was to last the entire academic year, progressing through a series of committee and individual reviews culminating in a review by the President of the University, who then made a recommendation to the Trustees. The Trustees made the final decision to grant or deny tenure.

Brown prepared a dossier describing her accomplishments. Under the heading "Research and Publication," she listed a book, *Jane Austen's Novels: Social Change and Literary Form,* a revision of her Ph.d dissertation that had been published by the Harvard University Press, and three book reviews or review essays. Brown listed "all reviews, discussions and major citations" of her book, which included a review in the *New York Times Sunday Book Review,* four other reviews, two "readers' reports" from Harvard University Press and a letter from Harvard University Press concerning a second printing of the book. Under "work in progress" Brown listed a proposed book about Oscar Wilde. During academic years 1979–80, the year of her tenure review, she had received a Mellon grant to research and write this book, as well as to teach at Harvard University. Brown attached to her tenure dossier the six page prospectus describing her planned study of Oscar Wilde that had earned her the $16,000 Mellon grant.

Under the category of teaching, Brown listed the courses she had taught at Boston University, including two she had developed, "Fiction and National Character" and "Freud and the Victorian Novel." In respect to advising, she stated that she advised 15–20 undergraduates in composing their class schedules, spending about an hour per year with each student. She also described her activities on a committee that assisted undergraduate English majors in choosing a graduate school, and noted that, in 1977–78, she conducted a "woman's literature discussion group for graduate students which met informally once every two weeks." In the category of service to the University, Brown noted that she had been asked to assist in editing the "Partisan Review" for 1979–80, and listed service on various Boston University committees.

The first stop for Brown's file was a committee composed of all the tenured professors in the English department. The department committee voted unanimously, by a vote of 22–0, to promote her to Associate Professor with tenure. The department chairman's rationale included high praise for Brown's teaching and scholarship. On September 14, 1979, the chairman wrote, "[a]s a teacher, Judy Brown has two talents in rare combination. She has a very detailed and exact grasp of works of literature and she is able to see them in a larger cultural and historical perspective." The chairman stated that Brown's book on Jane Austen had been widely recognized by noted critics. He opined that "[i]t is rare for an older, let alone a younger, critic to write an important book on a major writer ... but Judy Brown has done so." In describing the book, the chairman noted Brown's "sensitivity to the fact that Jane Austen was a *female* novelist." The recommendation continued, "Professor Brown has the requisite literary tact to write about Jane Austen as a female writer without the ideological distortion and special pleading that sometimes mar such criticism."

The next review was by the Appointments, Promotions and Tenure Committee ("APT") of the College of Liberal Arts (CLA). This committee also recommended tenure, again unanimously. The committee's report described her as an "excellent teacher" and "a first rank ... scholar," saying that "she is bound to become a most distinguished and nationally recognized critic and scholar." On December 7, 1979 the APT sent its report to the Dean of the CLA. Before making his own recommendation, the Dean met with Brown. At that meeting, the Dean gave Brown the opportunity to answer criticism received in a letter solicited from an outside scholar in Brown's field. The Dean also asked Brown about the amount of time she spent advising students. After this meeting, the Dean recommended promotion and tenure. However, the Dean's report contained reservations about Brown's "historical scholarship," citing certain negative comments in a review and in the outside scholar's letter. The Dean recommended that subsequent reviewers solicit the view of an historian from Harvard University. He suggested that if the criticisms of the historical scholarship in Brown's book proved to be valid, the University should offer Brown a three year extension of her probationary period, so that her work on Oscar Wilde could be

evaluated.[1] The Dean also characterized Brown's teaching as "fine," but expressed concern that she did not spend enough time advising students. The Dean sent a letter to Brown informing her that he had recommended her for tenure, but not mentioning the reservations he had expressed or his recommendation of a possible three year extension.

The week after the Dean completed his evaluation, Brown sent him a letter, along with additional material for her file. The letter dealt with the amount of time Brown spent advising students, saying that in addition to helping her advisees to prepare their schedules, she had office hours for four hours per week, of which most of her advisees took advantage. She included in the letter the names of three former advisees who would speak on her behalf. Brown also informed the Dean that her book had been nominated by the Harvard University Press, along with four others, for the James Russell Lowell Award, sponsored by the Modern Language Association.[2]

Notwithstanding the Dean's reservations, Brown received a further positive vote at the next level of review, a University-wide APT, which recommended tenure and promotion by a vote of 9–2. The committee report to the Provost concluded that "Dr. Brown is a serious and committed teacher-scholar who at a very early age has already made her imprint in one of the toughest and most competitive of fields...." Next, at the level of the Provost's review, an Assistant Provost, Simon Parker, evaluated Brown's candidacy. Parker's memo to the Provost expressed concern about the quality of Brown's book, although he praised the book generally. Parker recommended a three year extension, stating that "Brown's publishing achievements are limited in quantity to a revised dissertation and three book reviews.... The three year extension will enable her to finish this major *independent* work [the Oscar Wilde book], and

prove whether she is able to sustain and improve the quality of her work as a maturing humanist."

Soon after the Assistant Provost completed his assessment, Brown requested from her department head a maternity leave of absence for the upcoming semester, which was granted. Next, the Provost concurred with Parker's assessment and advised Brown that he had recommended to the University's President, Dr. John Silber, that she be given a three year extension. Since the three year extension clause of the agreement required the concurrence of Brown and all three committees,[3] her candidacy was again put to a vote. The 23 tenured members of the English department sent a letter to the Provost stating that "[i]t is the unanimous view of the Department that your recommendation ... does not take into account the substance of the case for Professor Brown made by the Department and Faculty Committees" and urging the Provost to make a recommendation of tenure. The College APT sent a brief memo stating that it "wish[ed] to reaffirm our original unanimous recommendation for tenure and promotion for Professor Brown." The University APT, which originally had voted 9–2 for tenure, wrote that its members agreed Brown's scholarship "had reached sufficient maturity to warrant our recommendation." The minutes of the Committee's meeting reveal that the "Committee unanimously (10/0) agreed to reaffirm its original positive recommendation. The members did not wish to reject the extension in the event that Professor Brown agreed to it." Another exchange of letters between the Provost and the Department resulted in the unequivocal statement of the Department Chairman that "the [Department] Committee ... refused to assent to a three year extension for [Brown] by a unanimous vote." On the same date, Professor Brown wrote to the Provost indicating that she did "not accept the recommendation of a three year extension."

1. While professors who were not granted tenure ordinarily had to leave after one more year, the Agreement allowed a three year extension of the normal six year probationary period "in occasional cases of substantial merit where a faculty member is potentially tenurable, but where further scholarly work is expected to be completed in short order." Such an extension required the agreement of the candidate and the various university groups and officials who passed on tenure. *See* n. 3, *infra*.

2. Brown testified that "[t]he award is given to the work of literary criticism judged most distinguished by a group of scholars every year."

3. The relevant portion of the agreement provides: "Such an extension shall be allowed only once for any candidate and only by agreement of the candidate, the department, the School APT [Appointment, Promotion and Tenure Committee], the University APT and the Administration."

In response, the Provost informed Brown that he had recommended against tenure. Because the Provost's recommendation was not in accordance with the judgments of the College and University APTs, Brown's case was forwarded to a three-member *ad hoc* Tenure Review Committee. The Agreement provided that the *ad hoc* Committee

> shall be composed of three impartial persons from outside of Boston University who shall be acknowledged authorities in the candidate's field or academic specialty. One of these three persons shall be designated by the Provost, one by the University APT, and one by mutual agreement between the two persons already designated.

The *ad hoc* committee voted for tenure by a margin of 2–1. The committee's report stated that the committee

> found Professor Brown's book on Jane Austen to be a substantial contribution to Austen studies.... [W]e evaluated the book as useful and sometimes brilliant; we were not much impressed by its historical dimensions and found the statements about historicity a bit misleading. We agreed that the mind behind the book was a first-rate one, one that perhaps still had some maturing to do, but one that was capable of excellent original critical thinking.

The report also stated, "[w]e all regretted that we had no further work on which to judge Professor Brown; one committee member felt that such a lack of evidence of wider commitment was crucial...."

Upon receipt of the *ad hoc* committee's report, the Provost reported to President Silber that "[t]he report does not give a strong, unqualified endorsement of the candidate's work. Rather it confirms my earlier judgment that Professor Brown has not yet established a sufficiently strong scholarly record to merit tenure at Boston University." President Silber then informed Brown that "I shall recommend to the Trustees that tenure not be granted."

Brown subsequently wrote to ask President Silber to reconsider her case, making several charges of unfair treatment and irregularities over the course of her tenure candidacy. Brown raised the issue of sex discrimination, telling President Silber that "[o]ne of the main problems that women in my profession have is that they are frequently put under the microscope, in a way that men often are not, when seeking promotion." Brown compared her qualifications to those of several men who had been granted tenure in her department and in the year of her candidacy, saying that both the Dean and the Provost may have held women to higher standards than those imposed on men who had been granted tenure. The Dean, Brown said, singled her out for unusual treatment, recommending that her work be reviewed by someone outside her field, a historian, when he made no such recommendation concerning the candidacies of several men who were up for tenure. Brown also suggested that the Provost's treatment of her case had been more exacting than his treatment of men candidates. Brown asserted that although the Provost's expressed concern was with the quantity of Brown's scholarly work, the Provost had recommended tenure for another man in Brown's department who had produced a smaller amount of scholarly work. President Silber responded that he had reviewed Brown's case as she requested, but that he would stand by his earlier decision. On President Silber's recommendation, the Trustees denied Professor Brown tenure.

Soon after receiving President Silber's final letter, Brown brought suit in the Massachusetts Superior Court, alleging that Boston University had violated the Agreement by discriminating against her on the basis of her sex.[4] Boston University removed the suit to the United States District Court for the District of Massachusetts, alleging subject matter jurisdiction under Section 301(a) of the Labor Management Relations Act ("Act"), 29 U.S.C. § 185(a)

---

**4.** Brown's complaint also alleged that Boston University had violated the terms of a settlement agreement entered into at the time the Agreement was negotiated, which provided that "there shall be no reprisals or abuse, either institutional or personal, against any member of the University community for his/her actions during the strike." Prior to the Agreement's execution, the Boston University faculty had engaged in a labor strike. Brown participated in the strike, picketing in front of President Silber's office and in front of an office of one of the University's Trustees. At trial, the jury found that Boston University had not discriminated against Brown on the basis of her strike activity. Brown has not appealed from that finding. Therefore, we address only the issues raised as a result of the jury's finding that Boston University discriminated against Brown because of her sex.

(1982), which confers federal jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees. . . ." After completing the required administrative procedures, Brown amended her complaint to include claims that the University's actions violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, and the Massachusetts anti-discrimination statute, Mass. Gen.L. ch. 151B § 4.

Prior to trial, the University moved for summary judgment as to Brown's contract claims[5] and for denial of Brown's jury demand as to all counts. The district court refused to grant summary judgment against Brown on her claim that the University had violated the Agreement. The court ruled that Brown was entitled to a jury trial on the contract claim, because "[a] complaint which alleges a breach by an employer of a collective bargaining agreement in which the plaintiff seeks back pay states a claim for legal damages, and the plaintiff has a right to trial by jury on that claim." Recognizing that Brown had no right to a jury trial on either the Title VII or the Chapter 151B claims, the court ruled that Brown's right to a jury trial on her contract claim extended to all issues common to the three separate claims. *See Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974). The most important factual issue common to the three claims was whether Boston University had denied Brown tenure because of her sex.

Brown's evidence at the trial compared her qualifications, including her published writing, with those of others, particularly males, in English and related fields who had been granted tenure. She placed in evidence the voluminous tenure files of herself and of the allegedly "similarly situated" faculty members. She called as witnesses several Boston University professors, including two former heads of the English Department, who had participated in her own tenure review as well as the tenure reviews of others during this period. Several witnesses interpreted scholarly reviews and gave their opinions on how to compare the various files. The thrust of Brown's comparative evidence was that she had been held to a stricter standard than her male peers.[6]

Brown also presented evidence of alleged irregularities in her tenure review, particularly with regard to the inclusion of the single dissenter on the *ad hoc* committee, whom Brown sought to show was a long-time associate of President Silber's, had previously clashed with faculty in Boston University's English Department, and was not, in Brown's view, an "acknowledged authority" within Brown's academic specialty, as required by the Agreement. Brown also introduced evidence from which she argued the jury could infer that President Silber and the Dean of the CLA harbored discriminatory attitudes towards women.

The University called as witnesses Geoffrey Bannister, the Dean of the College of

**5.** Brown's complaint included two contract claims, one for violation of the Agreement and one for violation of the covenant of good faith and fair dealing implicit in the Agreement. The district court granted summary judgment for the University on the latter, and no appeal was taken.

**6.** Brown introduced evidence showing that over the six year period prior to the time the University denied her tenure no single tenure candidate in the English department had a second published book, and that all the books published by tenure candidates in the department were based on the candidates' dissertations. (This contrasts with testimony from the President suggesting that Brown's qualifications were inadequate because she had published only one book, and that was based on her dissertation.) One male English teacher who was granted tenure shortly after the President made his final decision to deny Brown tenure had not written any book, and while he had written several articles, none of them had received reviews. The evidence also showed that during this time Brown

was the only candidate in the English department to be denied tenure after having published a book and having it reviewed. There was evidence that Brown's publisher, the Harvard University Press, had very high standards.

In addition, Brown's evidence showed that her support from the various tenure committees was quite high when compared to the votes on English professors who received tenure around the time of Brown's candidacy. While a couple of successful candidates received support comparable to Brown's, including unanimous votes from the English Department, there were others with much less support who nonetheless received tenure. The male English professor who received tenure shortly after Brown was denied tenure received a 16–6 vote in favor of tenure from the English Department; a 2–5 vote *against* tenure from the College APT committee; and an 8–3 vote in favor of tenure from the University APT committee. A male English professor who received tenure before Brown's review period had received a vote of 10–4 in favor of tenure from the English Department.

Liberal Arts; Simon Parker, the Assistant Provost; and John Silber, the President of the University. They testified that Brown was denied tenure and instead offered a three year extension, because of good-faith, non-discriminatory concerns regarding the adequacy of her scholarship.

The district court told the jury to decide whether Brown had met her burden of persuading them that the reason offered by the University for denying her tenure was a pretext for discrimination based on her sex. A special verdict form was handed to the jury. Among the questions on the form was "Do you find that the Trustees at Boston University refused to grant tenure to the plaintiff because of her sex?" The jury answered this question "yes," and found damages in the amount of $200,000 as a consequence of the breach of contract.

Although recognizing that Brown's claims under federal and state civil rights statutes were not, by themselves, triable to a jury, the court held that the jury's finding of sex discrimination under the contract claim was determinative of the University's liability under the two statutes. The district court determined that under those statutes, Brown was entitled to $15,000 for emotional distress and reinstatement to the position of associate professor with tenure.[7] The district court also enjoined the University "from discrimination on the basis of sex with respect to the appointment, promotion and tenure of faculty members, and in particular with respect to the promotion, salary or other benefits to which the plaintiff may become entitled," and awarded Brown her reasonable attorneys' fees and expenses of suit. The district court denied the University's subsequent motions for judgment notwithstanding the verdict and for a new trial.

On appeal, the University alleges error in the court's evidentiary rulings and in the jury charge. The University also contends that the district court lacked jurisdiction over the contract claim, hence erred in applying the jury's sex discrimination finding to the federal statutory claims. Further, the University contends that the district court's award of tenure impermissibly intruded into the operations of the Universi-

ty, and that the anti-discrimination injunction is overbroad.

## II. Applicable Law

Title VII of the Civil Rights Act of 1964 provides

[i]t shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000e–2(a)(1).[8] When Title VII originally was enacted, Congress exempted from it educational institutions. In 1972, however, Congress removed this exemption, in response to widespread concern about employment discrimination in educational institutions. See H.R.Rep. No. 238, 92d Cong., 2d Sess., reprinted in 1972 U.S.Code Cong. & Admin.News 2137, 2154–55 ("Discrimination against minorities and women in the field of education is as pervasive as discrimination in any other area of employment.... [W]omen have long been invited to participate as students in the academic process, but without the prospect of gaining employment as serious scholars.... The committee cannot imagine a more sensitive area than educational institutions where the Nation's youth are exposed to a multitude of ideas that will strongly influence their future development. To permit discrimination here would, more than in any other area, tend to promote misconceptions leading to future patterns of discrimination."); H.R.Rep. No. 554, 92d Cong., 2d Sess., reprinted in 1972 U.S.Code Cong. & Admin.News 2462, 2511–12 (noting that female faculty at institutions of higher learning were, in 1972, much less likely to be associate or full professors and that in 1965–66 the median salary of female full professors was $11,649 compared with $12,758 for men).

■■■ Title VII strikes a balance between protecting employees from unlawful discrimination and preserving for employers their remaining freedom of choice. Price Waterhouse v. Hopkins, —— U.S. ——, 109 S.Ct. 1775, 1785–86, 104 L.Ed.2d

College–Town, Division of Interco, Inc., v. M.C. A.D., 400 Mass. 156, 508 N.E.2d 587 (1987)).

7. The district court ruled that damages for emotional distress may be recovered under Massachusetts civil rights law. Brown v. Trustees of Boston University, 674 F.Supp. 393, 395 (D.Mass. 1987) (citing Bournewood Hospital, Inc. v. M.C. A.D., 371 Mass. 303, 358 N.E.2d 235 (1976);

8. The Massachusetts statute makes essentially the same provision. Mass.Gen.L. ch. 151B, § 4.

268 (1989). In tenure cases, courts must take special care to preserve the University's autonomy in making lawful tenure decisions.

> [C]ourts must be extremely wary of intruding into the world of university tenure decisions. These decisions necessarily hinge on subjective judgments regarding the applicant's academic excellence, teaching ability, creativity, contributions to the university community, rapport with students and colleagues, and other factors that are not susceptible of quantitative measurement. Absent discrimination, a university must be given a free hand in making such tenure decisions.

*Kumar v. Board of Trustees, University of Massachusetts*, 774 F.2d 1, 12 (1st Cir. 1985) (Campbell, C.J., concurring), *cert. denied*, 475 U.S. 1097, 106 S.Ct. 1496, 89 L.Ed.2d 896 (1986). At the same time, however, an employee's right not to be denied tenure for discriminatory reasons prevents insulating the tenure process from any judicial review. As in other forms of employment, an inference of discrimination can be derived from a showing that a university's given reasons for denying tenure to the plaintiff were "obviously weak or implausible," or that the tenure standards for prevailing at the tenure decisions were "manifestly unequally applied." *Id.* at 15. The essential words here are "obviously" and "manifestly." A court may not simply substitute its own views concerning the plaintiff's qualifications for those of the properly instituted authorities; the evidence must be of such strength and quality as to permit a reasonable finding that the denial of tenure was "obviously" or "manifestly" unsupported. In this case, Brown's burden was to show that the University *manifestly* applied an unequal standard to her tenure application.

### III. Evidentiary Issues

**A. Testimony of Professors Goodheart, Craddock, Vendler and Speisman and excluded testimony of Professor Clarke**

The University protests permitting four professors—Professor Goodheart, who served as Chairman of the English department at the time of Brown's tenure candidacy, Professor Craddock, Professor Speisman, and Professor Vendler—to compare Brown's qualifications with those of other faculty members considered for tenure at Boston University.[9] The University also complains that the district court erred in excluding the testimony of Professor Clarke, who chaired the College APT. Clarke would have testified that his vote for Brown was premised on a misperception of her progress on the Wilde book. We do not find prejudicial error.

■ The University contends that the four professors' testimony should have been excluded both because the testimony invited the jury to substitute its own tenure judgment for that of the University, and because these professors' testimony had not, as such, appeared in Brown's tenure file and, therefore, was unavailable to the University when it decided Brown's case.[10]

Federal Rule of Evidence 402 allows the admission of all relevant evidence and prohibits the admission of irrelevant evidence. Rule 403 permits the exclusion of relevant evidence of its probative value is outweighed by the danger of unfair prejudice or comparable factors. "A trial judge has much latitude in these matters." *Dente v. Riddell, Inc.*, 664 F.2d 1, 5 (1st Cir.1981) (citations omitted). "A district court's ultimate determination in such a situation is reviewed on appeal only for abuse of discretion." *United States v. Gonsalves*, 668 F.2d 73, 75 (1st Cir.), *cert. denied*, 456 U.S. 909, 102 S.Ct. 1759, 72 L.Ed.2d 168 (1982).

We see no abuse of discretion in admitting this evidence. Insofar as the four professors' testimony tended to show that the qualifications of others granted tenure were beneath Brown's *known* qualifications, it was relevant to create an inference that the University's criticisms of Brown's scholarship were pretextual. A sex discrimination plaintiff

> may attack the motive advanced by the university in one of two ways: she may try to show that the motive is not worthy of belief; or she may try to show that in

---

9. Brown asserts that the University has waived this issue by failing to object below to the specific testimony challenged in this appeal. We have reviewed the record and find that the University's objections sufficed to preserve the issue for appeal.

10. It is not denied that the four testifying professors had taken part in Brown's tenure review.

As English Chairman, Professor Goodheart had written the English Department's favorable evaluation and the others had voted for tenure. The University's point is that the express reasoning in Brown's favor set forth in their testimony, had never gone to the President, Provost, Dean and other evaluators at the time she was turned down.

fact some other motive explains the university's action better than the motive offered.... To prove the proffered motive is not worthy of belief, evidence of a comparative sort is appropriate: if others were hired or promoted though by the same reasoning they ought to have been excluded, then the motive is a "pretext."
*Namenwirth v. Board of Regents of University of Wisconsin System*, 769 F.2d 1235 at 1240 (7 Cir.1985) (citations omitted).

To be sure, in balancing the probativeness of evidence like this against its danger for unfair prejudice, a court should realize that comparing the qualifications of others granted tenure with those of plaintiff presents the risk of improperly substituting a judicial tenure decision for a university one. To admit such comparative evidence, the trial court must be satisfied, and we must later be satisfied on appeal, that the evidence is so compelling as to permit a reasonable finding of one-sidedness going beyond a mere difference in judgment.

That criterion was met here. The English Department voted 22–0 for tenure; the CLA APT was unanimous; the University-wide APT was almost unanimous at first and was unanimous a second time. The outside Tenure Review Committee favored tenure 2–1. The witnesses whose testimony is challenged included two former department heads who were well acquainted with the tenure process and with those who had been tenured or rejected around Brown's time. They testified that Brown was either superior or equal to the other candidates who had received tenure. They testified that none of these others had been required to write a second book. The first book of the others, rewritten from a thesis, had sufficed. One had not written any book. Yet notwithstanding acceptance and publication of Brown's book by a leading university press, the Assistant Provost and President, while acknowledging Brown's promise, insisted that she needed to do more to qualify for tenure. The court was entitled to conclude that a reasonable jury might in these circumstances properly find that the denial of tenure to Brown was "manifestly" unequal.

The University contends that the court improperly admitted as probative of Brown's scholarly credentials evidence of which the University lacked any knowledge when it denied tenure. We do not find this

happened, except in two unimportant instances later discussed.

Professor Goodheart and Professor Craddock compared Brown's qualifications with other members of the English department who were reviewed for tenure within a few years before and after Brown's review. While their specific testimony had not, of course, been presented to those who considered Brown at an earlier time, it rested upon, and evaluated, the contents of the relevant tenure files. Those files had been before the reviewing authorities and were in evidence at trial. The University was free to present, and did present, evidence of contrary opinions as to Brown's comparative qualifications.[11]

Professor Speisman's testimony compared Brown's qualifications to those of the other candidates in the year of Brown's review. Although his opinion that Brown was among the top four candidates was not expressed as such in any of the tenure files, he testified that it was possible to reach such a conclusion from reading the APT reports about the candidates. The APT reports were available to the University at the time it evaluated Brown. The Provost and President could present their own different conclusions from their own readings of the reports. As with the other opinion testimony, the University could introduce contradictory evidence of its own concerning the significance of the APT reports.

Professor Vendler's testimony similarly rested upon information that was available to the University at the time it evaluated Brown. In addition to comparing Brown's qualifications with those of others in the English Department, Vendler gave her opinion to the jury as to how to interpret the various scholarly reviews of the candidates' books. Both the reviews and publications were in evidence and had been before the persons evaluating the different applicants. Whether the reviews were "good" or "bad" was a disputed point. Evaluating them depended to some degree on the reputation of the reviewer in the field of the publication. It was within the court's discretion to allow expert opinion on this subject.

█ The University contends that the exclusion of Professor Clarke's testimony was prejudicial error. The University

---

**11.** Three of the University's witnesses—Dean Bannister, the Assistant Provost, Simon Parker, and President Silber—testified as to their opin-

ions concerning how Brown's qualifications compared to those of other tenure candidates.

sought to have Clarke, the chair of the College APT, testify that he and other members of the committee were under the mistaken impression that Brown's book about Oscar Wilde was "forthcoming," and that this influenced the vote in Brown's favor. The district court excluded this testimony, ruling that Clarke's thoughts, other than his "yes" or "no" vote, were not available to the University at the time it made the decision regarding Brown's tenure.

We believe that Clarke should probably have been permitted to so testify, although the University was less than clear as to the purpose for which it was offering the testimony. The court understood that the University was offering Clarke's testimony merely to impeach his previous affirmative vote for Brown. Why Clarke voted as he did was irrelevant, since only the vote appears in the tenure file, and there was no reason to let Clarke impeach the vote. A proper reason to have accepted Clarke's testimony, however, was that it demonstrated Clarke's opinion that progress on the Wilde piece was important. President Silber and Assistant Provost Simon later testified that one reason for withholding tenure for three more years was to await Brown's work on the Wilde piece. Clarke's testimony would have tended to show that their judgment in this regard was a reasonable one. Assuming, without deciding that the district court abused its discretion in not permitting Clarke's testimony for this purpose, we do not find that the ruling prejudiced the University. The University introduced ample other evidence that a reasonable reviewer would be interested in the development of Brown's work subsequent to her first book. The Dean testified to this effect, and the report of the ad-hoc tenure committee, which was introduced into evidence, referred to the Wilde book, and stated that all three members (two of whom voted for tenure) "regreted that [they] had no further work on which to judge Professor Brown; one member felt that such evidence of wider commitment was crucial." Particularly given the University's failure to make clear that Professor Clarke's testimony was being sought as evidence of an expert's opinion on the importance of the Wilde piece, we do not find reversible error in its exclusion.

■ There were two instances where the court improperly admitted testimony going to Brown's credentials which was not in her tenure file and was not otherwise admissible. First, the district court allowed Professor Craddock to testify about Brown's reputation within her field outside the University. Professor Craddock testified that Brown had established a reputation within her field among Craddock's colleagues outside the University that "would have been a credit to the [English] Department." Since Craddock did not indicate that the University administration knew of this, it was irrelevant to show bias. We see no harm from this testimony, for two reasons. First, the APT report in Brown's tenure file makes substantially the same point.

> [H]er scholarly accomplishments have been *widely recognized*. In a highly competitive field, her book was well reviewed in three very reputable journals (*Yale Review, Kirkus Review, Library Journal*) and in the *New York Times Sunday Book Review....* *[B]rown has already made her imprint in one of the toughest and most competitive of fields:* English literature.

(Emphasis added). Second, the district court gave the jury cautionary instructions on six occasions, three times during the trial and three times during the charge, not to substitute its judgment for that of the University on the issue of tenure. We find no prejudice to the University on this score.

The University also attacks admission of Professor Goodheart's following testimony:

Q. How does the quality of Brown's book compare with books you review as part of the Emerson Prize Committee?
A. ... I would have to see the other books, as well, to make the comparison, but, since I have read in this competition for three years, I know what the quality of the run of books is....
Q. How did Julia Brown's book compare to those books which made the finalist rounds, in terms of quality?
A. I think it is a comparable piece of work. I would certainly recommend it for further consideration. Whether it entered in the final round would depend upon the other books in the competition. That is speculative. That is hypothetical.

We see no material prejudice to the University from this testimony. It was, at best, a feeble endorsement of Brown's book. It was largely repetitive of material already

found in Brown's tenure file. Professor Goodheart himself prepared the Department Chairman's report which was a part of Brown's tenure file. In that report, he described Brown's book as "admirable." He also stated "[t]he distinction in Professor Brown's book is immediately manifest in the lucidity, elegance, and wit of the prose." Brown's tenure file contained the information that her book had been nominated for another prestigious prize. Any incremental increase in the jury's estimation of the book's praiseworthiness that may have resulted from Goodheart's testimony was negligible.

B. *Evidence of Remarks by President Silber*

■ The University challenges admission of remarks made by President Silber in 1982 and 1983, after Brown's tenure candidacy, relative to another female tenure candidate, Bonnie Costello. While being considered for tenure, Professor Costello was offered a tenured position at another university. As permitted by a provision in the collective bargaining agreement, Costello had asked President Silber to expedite her Boston University tenure review so that she could more intelligently deal with the other offer. Initially, Professor Craddock, then Chairman of the English Department, met with President Silber to discuss Costello's situation. Silber refused to speed up the process, although he did say that, when the file came to his desk, he would act on it swiftly. Professor Craddock testified that President Silber remarked that Costello was an outstanding scholar, saying "I don't see what a good woman in your department is worrying about. The place is a damn matriarchy." A few months later, Costello herself met with President Silber. Silber again refused to intervene in the tenure review process, telling Costello that a person with her credentials would do well "and anyway, I never worried about job security, and your husband is a parachute, so why are you worried[?]". Professor Costello rejected the outside offer and later in the year was granted tenure at Boston University. Brown also presented evidence that President Silber and the administration had expedited review in the case of a male professor who had received an outside offer.

Admission of evidence of these matters was not an abuse of the district court's discretion. Other courts have held that *prior* discriminatory conduct is recognized as probative in an employment discrimination case on the issue of motive or intent. *See* Fed.R.Evid. 404(b). The Seventh Circuit has remarked, "[g]iven the difficulty of proving employment discrimination—the employer will deny it, and almost every worker has some deficiency on which the employer can plausibly blame the worker's troubles—a flat rule that evidence of other discriminatory acts ... can never be admitted without violating Rule 403 would be unjustified." *Hunter v. Allis–Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1423 (7th Cir.1986). Accordingly, "[t]he question of the legitimacy of the employer's motivation in firing the employee ... is one upon which past acts of the employer has some bearing." *Morris v. Washington Metropolitan Area Transit*, 702 F.2d 1037, 1045 (D.C.Cir.1983). *See also Hunter*, 797 F.2d at 1423–24 (in an employment discrimination action, evidence of harassment against other black workers besides plaintiff was admissible to show that defendant "condoned racial harassment by its workers and [to] rebut[ ] [defendant's] defense that it had fired [plaintiff] for cause"); *Scaramuzzo v. Glenmore Distilleries, Co.*, 501 F.Supp. 727, n. 7 (N.D.Ill.1980) ("Evidence of past discrimination of an employer may in some circumstances support the inference that such discrimination continued...."). *Cf. Jay Edwards, Inc. v. New England Toyota Distributor, Inc.*, 708 F.2d 814, 824 (1st Cir.) (in dealer's action against distributor claiming bad faith actions on the part of distributor, evidence of distributor's actions with other dealers was admissible on the issue of distributor's intent regarding its dealings with plaintiff), *cert. denied*, 464 U.S. 894, 104 S.Ct. 241, 78 L.Ed.2d 231 (1983).

Derogatory remarks indicative of a discriminatory attitude are also admissible in a proper case. *See Hunter*, 797 F.2d at 1423 (in employment discrimination action, evidence that supervisor called blacks "niggers" was admissible to show what supervisor's racial attitudes were). *Cf. Carson v. Polley*, 689 F.2d 562, 571–73 (5th Cir. 1982) (performance evaluation report stating that defendant had a bad temper was admissible to show intent in action for assault and battery).

President Silber's conduct and comments were far weaker as indicative of a discrimi-

natory attitude than those we have mentioned. While Silber did not expedite review in Costello's case, he did offer her tenure. Still, his comments reflected a patronizing attitude toward women—an attitude that might possibly have affected his earlier decision in Brown's case. At the time Silber called the English Department a "damn matriarchy," it had a female chairman and six other tenured female professors from among a total of 26 tenured English professors. That so small a proportion of women could provoke this comment suggests that the President might not be indifferent to the gender of a tenure applicant. Silber's "parachute" remark, especially when made in an official setting, likewise suggested a preoccupation with gender in a context where both the contract and the law would expect a sex-blind approach.

To be sure, it is a tremendous leap to infer from remarks such as these that President Silber denied Brown tenure because of her gender. Besides recommending tenure for Costello, the evidence showed that President Silber had recommended tenure for many women. Nonetheless, the court correctly left the significance of the remarks to the jury. A judge should not exclude evidence which a reasonable jury might find relevant unless its probative value is substantially outweighed by the danger of unfair prejudice. Fed.R. Evid. 403.

That the remarks occurred subsequent, rather than prior, to the allegedly discriminatory conduct does not alter their admissibility. The jury was entitled to infer that any discriminatory animus toward women manifested in 1982 and 1983 would have existed in 1980 and 1981, when President Silber acted on Brown's case. Evidence of a discriminatory cast to the views of one person in a university community might not, of course, be probative if the individual's role in the tenure decision were minor. President Silber's recommendation, however, was the final and most important one in the chain of tenure recommendations. He provided leadership to the University community. The jury could have inferred that the Provost and Dean, the other administrators who expressed doubts about Brown's suitability, would have been sensitive to the President's attitudes concerning tenure candidates.

The reason given by the Provost and President for withholding tenure went not to Brown's teaching ability nor to any deficiencies in her service to the university community, but to her lack of academic excellence. Yet Brown was recommended for tenure by virtually all of her academic peers, both in her own department and outside. It could be concluded that her academic reputation was superior to many who were tenured. In such circumstances, the district court was entitled to permit plaintiff to focus on the personality and predilections of the President, insofar as these suggested that he held a more traditional view of the woman's place.

■ While we thus uphold evidence of the Costello interchanges, we do not sustain the court's admission of a portion of a speech given by President Silber at a Freedoms Foundation Symposium on Citizen Responsibilities in 1984. In the speech, Silber discussed the decline of the traditional family and the consequential deterioration of children's education. He stated,

the number of working mothers—that is, the proportion of children who do not have even one parent at home during the day—has increased sharply.... [T]he number of working wives—as opposed to working mothers with children under 18 —rose from 26 percent to 46 percent. Lack of parental supervision associated with both parents working explains in part that children typically watch 24 hours of television a week.

Brown asserts that this speech was relevant to show President Silber's view of working women, possibly explaining his motive in denying Brown tenure, especially in view of Brown's pregnancy and the birth of her first child during her tenure review. To our minds, this evidence is far afield. While evidence of *closely related* discriminatory conduct and remarks may be admissible in a case like this, it does not follow that plaintiffs may present ambivalent evidence. President Silber did not denigrate women in his speech. He did not say that women should not work; least of all did he suggest that professional women or others who might be able to obtain child care elsewhere should be denied promotion on merit. He merely quoted statistics showing the dimensions of a social problem that few people would deny exists, whatever the

proper solution may be. It is an untenable leap from such a speech to the inference that the author would deliberately deny tenure to a qualified faculty member. Its relevance, if not quite zero, is close to that. While one would hope that jurors would see them for what they are, there is the danger such red-herrings, skillfully manipulated, could cause a jury to stray. We fear, moreover, the chilling effect that admission of such remarks could have on academic freedom. Use of such evidence in a court of law could cause a university president, dean or teacher to avoid topics of this kind altogether for fear that one or two sentences might later be used as evidence of alleged discriminatory animus. It was error to admit these remarks.

█ While we hold that the evidence should have been excluded, we do not believe that it effected the outcome of the trial. As we have said, the evidence is without probative value of sex discrimination. That children watch television because their mothers are not at home is a position commonly advocated in the press (and on television itself). To be sure, the matter was mentioned by plaintiff's counsel in closing argument. Nonetheless, while we find the error regrettable, we think it highly unlikely that these remarks, in a trial of this complexity and length, would have had an effect on the outcome. We, therefore, do not find the improper admission of this evidence to be prejudicial error.

C. *Evidence of the Dean's Attitude Toward the Women's Studies Program*

█ The University next challenges the district court's admission of a letter written by the Dean concerning a Women's Studies Program. Boston University offered a minor in Women's Studies, for which students were required to take a core course and a number of courses from a list of approved electives. Professor Brown never taught Women's Studies, but some of her courses were included on the list of electives. In 1978, the Dean of the CLA, who was the first to express reservations about Brown's scholarship, wrote a letter responding negatively to a request for funding for a half-time director for the Women's Studies program.[12]

The University argues that the Dean's letter should not have been admitted, because Brown failed to show how the Dean's views on the Women's Studies Program had any bearing on her tenure. Brown argues that the evidence at trial showed that the approach in Brown's book was characterized by many as "a feminist interpretation" of Jane Austen. Brown further argues that the Dean's reservations about Brown's historical scholarship may have resulted from his general doubts about feminist scholarship.

For the same reasons given as to the President's speech, we hold that the district court erred in admitting this evidence. A panel of the Ninth Circuit has held that evidence of contempt for women's issues generally may in some circumstances be probative of a discriminatory attitude. *See Lynn v. Regents of the University of California,* 656 F.2d 1337, 1343 & n. 5 (9th Cir.1981) ("A disdain for women's issues, and a diminished opinion of those [including men] who concentrate on those issues, is evidence of a discriminatory attitude towards women."), *cert. denied,* 459 U.S. 823, 103 S.Ct. 53, 74 L.Ed.2d 59 (1982). But whether or not this is so in proper circumstances, we do not see how the Dean's expression of reservations about a particular academic department had, by itself, any tendency to show a discriminatory animus against women. Like the evidence of President Silber's speech, the admission of this kind of evidence totally removed from the incident that is the subject of the law suit worries us because of its effect on free speech in a university. A dean should not have to fear that he cannot express his opinion as to the *quality* of a particular studies program without this criticism being brought forward as evidence of sexism.

---

**12.** The body of the letter read:
My decision not to provide funding for a half-time director was not based on misapprehensions about the availability of grant funds. Frankly, it was based primarily on
　1.) having no money,
　2.) responding to the *committee's* request for someone "to write proposals",
　3.) reservations about the academic orientation of Women's Studies.
I believe the first two are immutable, but I am always open to discussion on the last. If there is a "distorted perception" of the scholarship, let us discuss it.

Still, when read in the context of this particular trial, we are not persuaded that the outcome was affected by the admission this evidence. We hold that the admission of this improper evidence was harmless error.

■ In addition to challenging the admission of much of Brown's evidence, the University argues that "the relevant, properly admitted, evidence is insufficient as a matter of law to support a finding of sex discrimination against the University." As we interpret this argument, the University is contending that if we remove the evidence discussed above, the remaining evidence is insufficient to support the verdict. Since we rule today that the district court made no prejudicial error in admitting the evidence at issue here, we need not address this argument. Moreover, we need not consider the issue of the sufficiency of the evidence generally, for the University has not properly raised this issue. *See* Fed.R. App.P. 28(a) (brief must contain statement of issues presented for review and argument with respect to such issues); *Ortega Cabrera v. Municipality of Bayamon*, 562 F.2d 91, 102 n. 10 (1st Cir.1977) (issue not argued on appeal is treated as waived). Even if the University's statement that the properly admitted evidence was insufficient could be treated as raising the issue of the sufficiency of the evidence generally, the University has nonetheless abandoned this issue by failing to argue the point in its briefs. *See, e.g., Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir.1988) ("Issues raised in a brief which are not supported by argument are deemed abandoned."); *Hershinow v. Bonamarte*, 735 F.2d 264, 266 (7th Cir. 1984) (court will not consider issue present-ed in "perfunctory and underdeveloped a manner in [appellant's] brief").

## IV. Jury Instructions

### A. Causation

■ The University's next argument is that the district court, in its jury charge, improperly defined the required connection between an employer's discriminatory motive and the action taken against its employee. The relevant statutory language provides that it is unlawful for an employer to take an adverse employment action "because of" an individual's sex. 42 U.S.C. § 2000e–2; Mass.Gen.L. ch. 151B, § 4. In a "pretext" case, such as here, a plaintiff who has shown that her sex was a "but for" cause of an adverse employment action has satisfied the statutory requirement of showing that the decision was "because of" her sex. *Price Waterhouse v. Hopkins*, — U.S. —, 109 S.Ct. 1775, 1785 n. 6, 104 L.Ed.2d 268 (1989). *See also Fields v. Clark University*, 817 F.2d 931, 935 (1st Cir.1987) (mixed motive case) (citing *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2580 n. 10, 49 L.Ed.2d 493 (1976)).[13]

The district court's jury instruction on causation included the following:

Now, when I say in these questions [the special interrogatories]: Do you find that the Trustees refused to grant tenure *because of* sex or *because of* strike participation, or *because of* some combination of the above, I mean did that factor that I referred to *affect the result? Would the result have been different* if there had been no sex discrimination or no

---

13. Justice Brennan's recent plurality opinion in *Price Waterhouse v. Hopkins*, — U.S. —, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), which addressed the proper causation standard in a "mixed motive" case, casts some doubt on the appropriate interpretation of *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). In *McDonald*, the Court stated, in the context of a "pretext" case, that "no more is required to be shown than that race was a 'but for' cause." 427 U.S. at 282 n. 10, 96 S.Ct. at 2580 n. 10. Subsequent decisions of this court have read *McDonald* to hold that an employee must prove "but for" causation. *See Loeb v. Textron, Inc.*, 600 F.2d 1003, 1019 (1st Cir.1979) (age discrimination) (followed in *Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1335 (1st Cir.1988)

and *Menard v. First Security Services Corp*, 848 F.2d 281, 285 (1st Cir.1988)). The plurality opinion in *Price Waterhouse* says, however,

[t]his passage [in *McDonald*] ... does not suggest that the plaintiff *must* show but-for cause; it indicates only that if she does so, she prevails. More important, *McDonald* dealt with the question whether the employer's stated reason for its decision was *the* reason for its action; unlike the case before us today, therefore, *McDonald* did not involve mixed motives.

*Price Waterhouse*, 109 S.Ct. at 1785 n. 6. Because it is not necessary to our decision in this case, we do not inquire whether, under *Price Waterhouse*, there are circumstances in which a "pretext" plaintiff could prevail if she proved something less than "but for" causation.

retaliation or no combination of the above procedure? That is to say, *did it bring about a difference in the resulting decision?*

(Emphasis added.) This instruction properly informed the jury that the plaintiff must show that but for the impermissible motive, the University would have granted tenure. *See, e.g., Geller v. Markham,* 635 F.2d 1027, 1035 (2d Cir.1980) (age discrimination) ("If age discrimination was a 'factor ... [which] made a difference,' then the employee's fortunes would have been 'different' without the discriminatory action and ... discrimination was therefore a 'but for' cause of the result that did take place.").

The University has no quarrel with the above-quoted portion of the court's instruction. Instead, they direct our attention to a later portion of the instruction, in which the court said:

Now, the law gives a great deal of discretion to the people in charge of a university. That is part of academic freedom also, that ... we do not interfere in the freedom of the university as an institution, and that means the universities have the right to exercise independent judgment in choosing faculty and its decision must be respected unless *tainted* by one or more or both of the illegal reasons asserted by the plaintiff....

The university has the right to be wrong except in those two respects. They can make any kind of mistake except a decision that is *tainted* by sex discrimination or retaliation for strike activity, and your disagreement in general terms is not a basis for a finding for the plaintiff unless you find that the decision was effectively *tainted* by those two illegal considerations.

(Emphasis added.) The University asserts that the court's use of the word "taint" renders this portion of the instruction erroneous and prejudicial. The University claims that rather than describing a "but

for" standard of causation, the district court's use of "taint" three times suggested to the jury that it could find for Brown if the University's tenure decision was "affected slightly" with sex discrimination.

"Our principal focus in reviewing jury instructions is to determine whether they tended to confuse or mislead the jury on the controlling issues." *Service Merchandise Company v. Boyd Corporation,* 722 F.2d 945, 950 (1st Cir.1983) (citing *Green v. Edmands Company,* 639 F.2d 286, 289 (5th Cir.1981); 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2558 at 668 (1971)). "On appeal, the charge must be examined as a whole; portions of it are not to be treated in isolation." *Id.* We agree with the University that a "tainted" decision is not necessarily one that would have been different "but for" the taint.[14] We do not think that in the context of the jury instruction as a whole, however, the district court's "taint" remarks confused the jury. First, the court correctly instructed the jury that the words "because of" in the special interrogatories meant that the impermissible factors must have brought about "a difference in the resulting decision." Then, the court reiterated that "the plaintiff's burden here is that she has to prove—has to persuade you that it is more likely true than not true that she was denied tenure *because of* her sex or *because of* her strike activity or *because of* some combination of the two." (Emphasis added). The three "taint" remarks were contained in two paragraphs immediately following the above, which discussed not the meaning of "because of," but described the university's prerogative to make bad, but not illegal, decisions.

Later in the instruction, in describing the law about "pretext," the court also stated three times that the jury's function was to determine whether the University's reason was so unworthy of belief that it was probable that one or more of the illegal reasons

---

14. "Taint" means "to touch or affect slightly with something bad or undesirable" or "to contaminate morally." *Webster's Third New International Dictionary* (1971). An employment decision impermissibly motivated by discrimination proscribed by Title VII can accurately be described as "tainted" or "infected" with discrimination. *See, e.g., Fields v. Clark University,* 817 F.2d 931, 932–33 (1st Cir.1987) ("The [district] court found that the process by which plaintiff was denied tenure at Clark University

was tainted with sexual discrimination"; also found decision was "impermissibly infected with sexual discrimination"). But an employment decision can be "tainted" with discrimination without the "taint" making a difference in the outcome. *See Price Waterhouse,* 109 S.Ct. at 1804 (O'Connor, J., concurring in judgment) (criticizing plurality opinion for appearing "to conclude that if a decisional process is 'tainted' by awareness of sex or race in any way, the employer has violated" Title VII).

were the "true reasons" or "real reasons" for denying Brown tenure. The concept of a "true" or "real" reason suggests "but for" causation. The jury could not have decided that discrimination was the "true" reason for the University's decision without concluding that but for discriminatory animus the University would have made a different decision regarding tenure for Professor Brown.

The "taint" remarks were thus sandwiched between several statements which accurately defined the meaning of the words "because of" on the special interrogatory forms and several statements that sex must be the "true" or "real" reason for discrimination. In that context, we do not see a likelihood that the three references to "taint" confused or misled the jury with respect to the applicable causation standard.

### B. *Jury's Role*

The University also complains that the district court's instructions encouraged the jurors to substitute their own judgment about the merit of Brown's tenure candidacy, in contravention of *Kumar*, instead of merely deciding whether the University impermissibly discriminated against Brown. The University complains both that the jury charge implied that the jury was to determine whether Brown deserved tenure, and that the court refused to give a requested instruction which would have made clear for the jury its role in reviewing the evidence. We see no merit to either of these arguments.

■ First, the University complains about a portion of the jury instruction which included the following:

> Whether the plaintiff deserves tenure or not is not the test here, either. I would suppose that deserving people are sometimes awarded tenure and sometimes not. Certainly, before you get—that is not the full test; that is certainly one thing you have to consider. Obviously, if she didn't deserve tenure on any kind of objective basis, the university was quite right in turning her down. *If you find that she did deserve tenure,* she was qualified on an equal basis, then you have the question of whether she was turned down for one or two of these illegal reasons that I have mentioned. That is the key to the case.

(Emphasis added.) We agree that the court would have erred had it told the jury that it should find for Brown if it found that she deserved tenure. But this instruction did no such thing. On the contrary, it specifically states that "whether the plaintiff deserves tenure or not is not the test." The emphasized portion reinforces this by informing the jury that it is not enough to find that she deserved tenure, but rather the jury must find that she was denied tenure because of her sex and not simply because the University made a mistake. We think this instruction correctly stated the law.

■ The University also complains that the court erred by refusing to give a requested instruction. The omitted instruction was:

> In determining whether the reasons for the tenure decision are obviously weak or implausible, you should not attempt to determine whether the opinions of scholars are correct or incorrect. A university has the discretion to evaluate and weigh the opinions of scholars as it sees fit. As long as Boston University's evaluation of a candidate's scholarship is supported by some of the scholarly opinion submitted to it, the University's evaluation of the candidate's scholarship will not support a claim of discrimination.

We think the court could properly determine that the requested instruction, particularly the final sentence, went too far. It would virtually insulate the University from review of *any* tenure decision, including those based on impermissible discrimination. The district court gave several instructions, both during the trial and in the charge, that sufficiently advised the jury that it was not to substitute its own judgment on the merits of Brown's tenure candidacy for that of the University. "As long as the judge's instruction properly apprises the jury of the applicable law, failure to give the exact instruction requested does not prejudice the objecting party." *McKinnon v. Skil Corp.*, 638 F.2d 270, 274 (1st Cir.1981) (quoted in *Service Merchandise Company, Inc.*, 722 F.2d at 950). This is, of course, especially so when the requested instruction is itself incorrect.

### V. *The Contract Claim*

The University next argues that the district court erred in denying the University's

motion to dismiss Brown's contract claim for lack of subject matter jurisdiction and in ruling that the contract gave Brown a judicially enforceable right to a discrimination-free tenure decision.

A. *Subject Matter Jurisdiction*

The University claims the district court lacked subject matter jurisdiction over Brown's claim that her tenure denial violated the Agreement. This result follows the University argues, from a 1986 National Labor Relations Board ("Board") decision that the University need not bargain with the Chapter as its faculty members were "supervisors" rather than employees. This ruling, the University maintains, deprived the federal courts of subject matter jurisdiction under Section 301(a) of the Labor Management Relations Act ("Act"), because the Agreement could no longer be regarded as is one between an employer and a labor organization representing employees.

This court recently has described the labor dispute at Boston University as follows.

On October 18, 1974, the Union filed a petition for representation with the Board, seeking certification as the collective bargaining agent for a unit composed of all regular full-time faculty members at the University except for those in the Schools of Law, Dentistry and Medicine. The University objected to the appropriateness of the unit, alleging that the full-time faculty were excluded from coverage of the Act by virtue of either their supervisory or managerial status. Notwithstanding said objections, the Board ordered and held an election in which a majority of those employees presumably eligible voted in favor of being represented by the Union. ... [T]he Union was certified by the Board as the bargaining representative of the unit sought.

The Union's bargaining request was rejected by the University, leading to the filing of [unfair labor practice charges]. The [Board] ... ordered [the University] to bargain with the Union.... [T]his court ... affirmed the Board.

*Boston University Chapter, American Association of University Professors v. N.L.R.B.*, 835 F.2d 399, 400 (1st Cir.1987) (footnotes omitted). The University faculty thereafter went out on strike, but the strike was settled on April 13, 1979, when the University and the Chapter entered into the Agreement, which expressly was made "subject to the final disposition" of the case then pending in the courts.[15]

On July 11, 1978, the University petitioned the Supreme Court for a writ of certiorari. On February 20, 1980, while [the] petition was still pending, the Supreme Court decided *N.L.R.B. v. Yeshiva University*, 444 U.S. 672 [100 S.Ct. 856, 63 L.Ed.2d 115] (1980), ... which in substance holds that under given factual circumstances university faculty members shall be considered managerial employees excluded from coverage by the Act. On March 3, 1980 the University's petition was granted and the judgment of this court recalled and remanded for further consideration in light of the ruling in *Yeshiva*. *Trustees of Boston University v. N.L.R.B.*, 445 U.S. 912 [100 S.Ct. 1271, 63 L.Ed.2d 597] (1980).

*Id.*

On April 17, 1981, following the procedure set out in the Agreement, the University informed Professor Brown that it was denying her tenure. Brown then filed this action in the Massachusetts Superior Court, alleging a breach of the Agreement. The University removed the action to federal district court, pursuant to Section 301(a) of the Act, 29 U.S.C. § 185(a).[16] Brown subsequently amended her complaint to in-

---

**15.** The Agreement provided:

It is understood that the collective bargaining Agreement is subject to the final disposition of First Circuit Cases Numbers 77–1143, 77–1365, and 77–1226, now pending in the Supreme Court of the United States upon a petition of certiorari (No. 87–67). However, it is agreed that, by the execution of the settlement Agreement, neither party waives any of its rights with respect thereto; and it is further agreed that the foregoing does not prejudice the Chapter's right to claim that this agreement remains in effect for its duration.

**16.** Federal subject matter jurisdiction over certain labor disputes is granted by the following:

§ 185 Suits by and against labor organizations

Venue, amount, and citizenship

(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting com-

clude claims under Title VII and Chapter 151B.

On September 30, 1986, the Board ruled on remand from the Supreme Court that full-time faculty at Boston University are managers/supervisors, not employees subject to the Act, and dismissed the charge against the University. *Trustees of Boston University*, 281 N.L.R.B. No. 115, 123 L.R.R.M. 1144 (1986). Almost a full year later, the jury trial in Brown's case took place. The jury returned a verdict for Brown on her contract claim on July 28, 1987. On September 22, 1987, before the district court had ruled on the Title VII and Chapter 151B claims, the University filed with the district court a motion to dismiss the contract claim for lack of subject matter jurisdiction. The University argued that since it was now evident that the Agreement was not a "contract between an employer and labor union representing employees," Section 301(a) no longer provided the district court with subject matter jurisdiction over Brown's contract claim. Moreover, the University argued, the district court was *forbidden* to enforce the contract, pursuant to Section 14(a) of the Act, which provides that "no employer subject to this Act shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining." 29 U.S.C. § 164(a) (1982).

On September 23, 1987, the district court denied the University's motion, ruling that since there was federal subject matter jurisdiction over Brown's Title VII claim, the court would exercise pendent jurisdiction over the contract claim, treating it as a Massachusetts state law claim. Soon thereafter, a panel of this court affirmed the Board's ruling that Boston University was not required to bargain with the Chapter. *See Boston University Chapter, American Association of University Professors v. N.L.R.B.*, 835 F.2d 399 (1st Cir. 1987). The time for the Chapter to petition the Supreme Court for a writ of certiorari expired in April, 1988.

▮ In the present appeal, the University argues that the district court erred in exercising pendent jurisdiction over Brown's contract claim. We disagree. The district court plainly had federal question jurisdiction over Brown's Title VII claim. *See* 28 U.S.C. § 1331 (1982). A district court may exercise pendent jurisdiction over a state claim whenever it is joined with a federal claim which "derive[s] from a common nucleus of operative fact" and where the plaintiff "would ordinarily be expected to try [both the federal and state claims] in one judicial proceeding...." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). In this case, the state claim alleging violation of the anti-discrimination clause of the contract exactly paralleled the federal Title VII claim. It lay within the district court's discretion, therefore, to exercise pendent jurisdiction over Brown's contract claim.[17]

▮ While apparently not contesting the preceding analysis, the University argues that the district court erred in enforcing the Agreement under state law. The University contends that Section 14(a) of the Act, by decreeing that no employer "shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of *any* law" (emphasis added), bars enforcement of the Agreement in this court under either state or federal law, because it now has been determined that the Chapter is a "supervisors' union" rather than an "employees' union." Therefore, the argument goes, enforcement of the Agreement would compel the University (the employer) to deem the faculty (supervisors) as employees, in contravention of Section 14(a).

There may be force to this argument (although we do not decide), but the University has waived the argument by raising too late. The issue is not jurisdictional; rather its foundations rest on the contention that Brown failed to state a claim upon which relief can be granted. *See* Fed.R. Civ.P. 12(b)(6). Section 14(a) does not pur-

---

merce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
29 U.S.C. § 185(a).

**17.** We need not determine whether the Board's reversal of its original determination that an employer must bargain with a union can oust a district court of subject matter jurisdiction that it had at the time the complaint was filed.

port to divest federal and state courts of jurisdiction over claims against supervisors. Rather it merely forbids courts to order employers to deem as employees those who actually are supervisors. The University's argument is, therefore, that Brown brought her claim under an unenforceable agreement.

[I]t is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy.

*Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946) (quoted in *Brule v. Southworth,* 611 F.2d 406, 409 (1st Cir.1979)).

Unlike a lack of subject matter jurisdiction—a defense that may be considered at any point in a judicial proceeding, *see* Fed. R.Civ.P. 12(h)(3),—the defense of failure to state a claim is normally waived if not raised "at the trial on the merits" or before. Fed.R.Civ.P. 12(h)(2) ("A defense of failure to state a claim upon which relief can be granted ... may be made in any pleading ..., or by motion for judgment on the pleadings, or at the trial on the merits."). Because the University did not raise the question whether Section 14(a) bars judicial enforcement of the Agreement until after the jury reached its verdict, it waived its right to assert this defense. *See Black, Sivalls & Bryson, Inc. v. Shondell,* 174 F.2d 587, 590–91 (8th Cir.1949) (defendant who raises defense of failure to state a claim for first time in motion for judgment notwithstanding the verdict has waived that defense); *Brule v. Southworth,* 611 F.2d 406, 409 (1st Cir.1979) (12(b)(6) defense cannot be raised for first time on appeal). *See also Snead v. Department of Social Services of City of New York,* 409 F.Supp. 995, 1000 (S.D.N.Y. 1975) ("the clear thrust of [Rule 12(h)(2) ] is that a failure to state a claim may be raised at any time *before* a disposition on the merits but not *after* "), *vacated on other grounds,* 425 U.S. 457, 96 S.Ct. 1630, 48 L.Ed.2d 88 (1976). *Cf. Sulmeyer v. Coca Cola Co.,* 515 F.2d 835, 846 (5th Cir.1975) (a party who fails to raise issues "during the trial [is] not entitled to raise those issues in its motion for judgment n.o.v.").

The University argues that even if its argument is not jurisdictional, it preserved this defense by specifically raising the defense of failure to state a claim upon which relief can be granted in its answer to Brown's complaint. We disagree. A general defense that the complaint fails to state a claim ordinarily will not preserve unarticulated arguments in support of that defense. *See Smeed v. Carpenter,* 274 F.2d 414, 418 (9th Cir.1960) ("The failure of appellee to bring to the trial court's attention the particulars upon which it relies in its assertion that the complaint failed to state a claim upon which relief could be granted constitutes a waiver of its right to rely on that defense."); *C. Albert Sauter Co., Inc. v. Richard S. Sauter Co., Inc.,* 368 F.Supp. 501, 510–11 (E.D.Pa.1973) (same). *Cf. Libertyville Datsun Sales v. Nissan Motor Corp.,* 776 F.2d 735, 737 (7th Cir.1985) (where party raises specific argument for first time on appeal, it is waived even though "general issue" addressed by the argument was before the district court).

■ Although in unusual circumstances, we may reach issues not timely raised, there are no such circumstances here. *See In re Grand Jury Proceedings,* 875 F.2d 927, 933 (1st Cir.1989) (absent plain error, failure to raise objection in district court deprives appellant of right to raise matter on appeal) (citing *United States v. Griffin,* 818 F.2d 97, 99–100 (1st Cir.) *cert. denied,* 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987); *United States v. Krynicki,* 689 F.2d 289, 291 (1st Cir.1982)). *See also Weaver v. Bowers,* 657 F.2d 1356, 1361–62 (3d Cir.1981) (considered Rule 12(b)(6) motion, even though not raised until after trial, in the interests of "evenhandedness in the administration of justice"), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982). We do not see plain error in the district court's exercise of pendent jurisdiction over Brown's contract claim. Nor are there any special circumstances here warranting deviation from our ordinary rule that, on appeal, we do not consider issues waived in the court below. On the contrary, it would be unjust to allow the University to prevail on the grounds asserted here. The Board's original order was vacated almost seven years

before the trial on the merits in this case, and the Board definitively ruled that the University was not required to bargain with the union almost a full year before the trial. We can conceive of no legitimate reason for the University to have waited until the twelfth hour, *after* the jury reached a verdict against defendant on the claim in question, to move to dismiss on these particular grounds. The district court expressed outrage at the University's conduct, characterizing as "reprehensible" the actions of the University in waiting until after a long and expensive trial to raise a "jurisdictional" issue, when the University had been aware of the Board's ruling for almost a year before trial. Like the district court, we do not condone delaying tactics of this sort. If the University preferred to go forward before a jury until after the jury decided against it, there is no injustice to making it abide by its choice. *See Brule,* 611 F.2d at 409 ("Defendants now wish to breathe new life into their waived defense of failure to state a claim by presenting it as a challenge to the court's subject matter jurisdiction—the latter being an issue which, of course, neither the parties nor the court could waive. We see no merit in this approach.").[18]

### B. *Enforceability of the Agreement*

■ The University also argues that the Agreement itself precludes judicial review of a tenure decision. The district court ruled that Article XI of the Agreement, the "No Discrimination" provision, afforded Brown a judicially enforceable right to a discrimination-free tenure decision.[19] The district court reasoned that because the substance of a tenure decision is non-grievable, it would be superfluous to have included the non-discrimination clause if the parties had not intended to provide employees with a separate right to sue under the Agreement.

The University's argument on this appeal is grounded in Article V.C.8 of the Agreement, which provides that "The decision of the Trustees shall be final and not subject to the grievance procedure." The University argues that limitations on the arbitrability of a grievance, such as this, limit an employer's substantive obligation, and correspondingly limit the jurisdiction of a court over an action for breach of contract. The University finds further support for its position in Article II of the Agreement, which provides that the Trustees

> have full power and authority ... to elect ... professors ... and to determine the duties, salaries, emoluments, responsibilities and tenures of their respective offices.... Except as delegated by the provisions of the Agreement for its terms, all rights, powers, privileges, duties, responsibilities, and authority are retained by the Trustees.

The University contends that these provisions indicate that the Trustees were to retain final authority in tenure decisions, and that these decisions were not to be subject to judicial review under the contract.

We express no view on these assertions as a matter of contract interpretation, because the University has waived this issue by raising it too late. Contrary to the University's assertion in its appellate brief, it did not raise this issue in its pre-trial motion for partial summary judgment. Although the University did argue on summa-

---

**18.** The University suggests that it was inappropriate, under principles of comity, for the district court to have interpreted Brown's contract as a state common law claim over which it could assert pendent jurisdiction. The University grounds this argument in several Massachusetts court opinions which the University interprets as holding that common law discrimination claims may be barred by the Massachusetts antidiscrimination statute. We do not agree. The cases cited by the University, particularly *Mouradian v. General Electric Co.,* 23 Mass.App. 538, 503 N.E.2d 1318, *review denied,* 399 Mass. 1105, 507 N.E.2d 1056 (1987), indicate that the state court is hesitant to adopt *new* common law claims paralleling claims that can be brought

under the state statutory scheme. The reasoning of these cases does not apply to a claim such as Brown's, which being brought under an express contractual provision could hardly be characterized as a new common law cause of action.

**19.** The Agreement's Article XI provides:
> The Trustees, the Administration, the schools and departments of Boston University, and the Chapter shall practice no unlawful discrimination on the basis of race, religion, national origin, sex, age, marital status, or physical handicap. Allegations of violations of this provision shall be directed to the appropriate governmental agency.

ry judgment that the contract did not create a judicially-enforceable right to a discrimination-free tenure decision, it did so on grounds significantly different from those advanced before this court on appeal. In the motion for partial summary judgment, the University argued that Brown was not entitled to bring an action in court because she had failed to follow the grievance procedures delineated in the Agreement. The University argued forcefully that Brown's claim was *not* removed from the grievance procedure provided in the Agreement. The University also argued that Article XI, the "No Discrimination" provision, did not create a right to discrimination-free employment decisions that could be enforced through a breach of contract action, but rather embodied the parties' intention that discrimination claims would be channeled through the administrative procedures created by federal and state anti-discrimination statutes.

The University's present position, that the Agreement removes tenure decisions from the grievance mechanism and, a fortiori, precludes judicial review of those decisions, was first framed in the University's motion for judgment notwithstanding the verdict. As this argument is most aptly characterized as a motion to dismiss for failure to state a claim, the University waived its right to raise the issue by bringing it after "the trial on the merits." *Shondell,* 174 F.2d at 590–91; Fed.R.Civ.P. 12(h)(2). *See* Section V.A, *supra.*[20]

**20.** The University may also have been precluded from raising this issue by its failure to raise it in a motion for a directed verdict as required by Federal Rule of Civil Procedure 50. *See, e.g., Baskin v. Hawley,* 807 F.2d 1120, 1129–30 (2d Cir.1986) ("Fed.R.Civ.P. 50(b) generally prohibits judgment n.o.v. on any ground not raised in a motion for a directed verdict."). The University's motion for a directed verdict did not rely on the grounds asserted here, but stated "Boston University also does not waive its contention that claims under the collective bargaining agreement are barred by plaintiff's admitted failure to complete the Agreement's grievance and arbitration procedure."

**21.** There are no cases, however, *denying* an award of tenure to a professor who has been found to be the victim of a discriminatory tenure decision.
 Courts of appeals have upheld judicial tenure awards in two instances. In 1980, the Third Circuit upheld a conditional tenure award in *Kunda v. Muhlenberg College,* 621 F.2d 532 (3d Cir.1980). The district court in *Kunda* had

## VI. The Order to Grant Tenure

We turn now to the matter of the district court's order that the University reinstate Brown with tenure. Courts have quite rarely awarded tenure as a remedy for unlawful discrimination, and those that have, have done so under circumstances distinguishable from those here.[21] The University argues that tenure is a significantly more intrusive remedy than remedies ordinarily awarded in Title VII cases, such as reinstatement or seniority, because a judicial tenure award mandates a lifetime relationship between the University and the professor. The University further contends that due to the intrusiveness of tenure awards and the First Amendment interest in academic freedom, a court should not award tenure unless there is no dispute as to a professor's qualifications. Thus, the University concludes, the district court should not have awarded tenure to Brown, because there existed a dispute as to her qualifications.

We agree that courts should be "extremely wary of intruding into the world of university tenure decisions," *Kumar,* 774 F.2d at 12, (Campbell, C.J., concurring). However, once a university has been found to have impermissibly discriminated in making a tenure decision, as here, the University's prerogative to make tenure decisions must be subordinated to the goals embodied in Title VII. The Supreme Court has ruled that the remedial provision of Title VII, 42 U.S.C. § 2000e–5 (1982),[22] re-

found that the college discriminated on the basis of sex against a female professor by denying her tenure because she did not have a master's degree, without telling her in advance that she needed one. The court of appeals upheld the district court's order that the professor be granted tenure if she obtained a master's degree within two years. In 1984, the Sixth Circuit upheld an order reinstating a professor, with tenure, to an institution which automatically awarded tenure after five years of successful teaching. *Ford v. Nicks,* 741 F.2d 858 (6th Cir. 1984). The professor in *Ford* had been discharged, after four years, in retaliation for helping his wife file a sex discrimination claim against the school. The University argues that *Kunda* and *Ford* are distinguishable on their facts from this case, because there was no dispute over the professors' qualifications, as there was over Brown's.

**22.** The statute provides:
 If the court finds that the respondent has intentionally engaged in ... an unlawful employment practice ..., the court may ... or-

quires courts to fashion the most complete relief possible for victims of discriminatory employment decisions. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975). Once Title VII liability has been imposed, a court should deny "make whole" relief "only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Id.*

We see no reason to deny Brown such "make whole" relief here. We disagree with the University's characterization of the tenure award as an infringement on its First Amendment right to determine for itself who may teach. In often-quoted language, Justice Frankfurter defined academic freedom as " 'an atmosphere in which there prevail the four essential freedoms of a university—to determine for itself *on academic grounds* who may teach, what may be taught, how it shall be taught, and who may be admitted to study.' " *Sweezy v. New Hampshire,* 354 U.S. 234, 263, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring in result) (emphasis added) (quoting from a statement of a conference of senior scholars from the University of Cape Town and the University of the Witwatersrand, including A. v. d. S. Centlivres and Richard Feetham, as Chancellors of the respective universities). Academic freedom does not include the freedom to discriminate against tenure candidates on the basis of sex or other impermissible grounds. *See Powell v. Syracuse University,* 580 F.2d 1150, 1154 (2d Cir.1978). Our decisions in this area have formulated a university's prerogatives similarly. While we have been and remain hesitant to interfere with universities' independent judgment in choosing their faculty, we have said that we will respect universities' judgment only "so long as they do not discriminate." *Kumar,* 774 F.2d at 12, (Campbell, C.J., concurring).

The University also argues that the special needs of academic institutions counsel imposition of less restrictive alternative remedies. However, the University suggests none. Some *amici* suggest that Brown be reinstated for a three year probationary period, or be subjected to a non-discriminatory tenure decision. Aside from the impracticality of the latter, well over eight years after the original decision, these suggestions fall far short of remedies which will make Brown whole. According to the jury's verdict, she was offered the three year extension *because* of discrimination. The jury found that, "but for" sex discrimination, Brown would immediately have been granted tenure. Awarding her tenure is the only way to provide her the most complete relief possible. *See Albemarle Paper Co.,* 422 U.S. at 421, 95 S.Ct. at 2373.

The conclusion that tenure is an appropriate Title VII remedy is borne out by the statute's legislative history. In 1972, Congress both amended the remedial portion of Title VII, granting courts broad discretion to fashion "make whole" remedies, and removed the then-existing Title VII exemption for educational institutions. A Congressional report notes, "women have long been invited to participate in the academic process, but without the prospect of gaining employment as serious scholars." H.R. Rep. No. 238, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Admin.News 2137, 2154–55. The process of becoming a "serious scholar" necessarily includes· a fair opportunity to become tenured, because tenure serves to ensure academic freedom, by allowing " 'a faculty member to teach, study, and act free from a large number of restraints and pressures which otherwise would inhibit independent thought and action.' " Note, *Tenure and Partnership As Title VII Remedies,* 94 Harv.L.Rev. 457, 474 & n. 104 (1980) (quoting C. Byse & L. Joughin, *Tenure in American Higher Education* 2 (1959)). Thus, to deny tenure because of the intrusiveness of the remedy and because of the University's interest in making its own tenure decisions would frustrate Title VII's purpose of "making persons whole for injuries suffered through past discrimination." *Albemarle Paper Co.,* 422 U.S. at 421, 95

der such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ..., or any other equitable relief as the court deems appropriate.... No order of the court shall require

the admission or reinstatement of an individual ... if such individual was ... refused advancement ... for any reason other than discrimination on account of race, color, religion, sex or national origin....

42 U.S.C. § 2000e–5(g).

S.Ct. at 2373. We add that Brown's near unanimous endorsement by colleagues within and without her department suggest strongly that there are no issues of collegiality or the like which might make the granting of tenure inappropriate.

### VII. The Injunction Against Further Discrimination

 The final issue raised on appeal regards the district court's order that "[t]he defendant is enjoined from discrimination on the basis of sex with respect to the appointment, promotion and tenure of faculty members, and in particular with respect to the promotion, salary or other benefits to which the plaintiff may become entitled." The University argues that the injunction is overbroad insofar as it enjoins the University from sex discrimination against faculty other than Professor Brown, because it is tantamount to an injunction to "obey the statute," which the Supreme Court rejected as too broad in *N.L.R.B. v. Express Publishing Co.*, 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930 (1941). The hazard of such an injunction, warns the University, is that the order has the potential to further embroil the courts in the University's internal affairs, allowing faculty members to circumvent administrative procedures by simply invoking the contempt jurisdiction of the district court whenever a dispute arises.

We agree. An injunction should be narrowly tailored to give only the relief to which plaintiffs are entitled. *See Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979). Ordinarily, classwide relief, such as the injunction here which prohibits sex discrimination against the class of Boston University faculty, is appropriate only where there is a properly certified class. *See Zepeda v. United States I.N.S.*, 753 F.2d 719, 727–28 & n. 1 (9th Cir.1983). Of course, "[a]n injunction ... is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in ... [a] lawsuit—even if it is not a class ac-

tion—if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Professional Association of College Educators, TSTA/NEA v. El Paso County Community College District*, 730 F.2d 258, 273–74 (5th Cir.) (citing *Meyer v. Brown & Root Construction Co.*, 661 F.2d 369, 374 (5th Cir.1981); *Gregory v. Litton Systems, Inc.*, 472 F.2d 631, 633–34 (9th Cir.1972)), *cert. denied*, 469 U.S. 881, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984). But there is no such reason here for an injunction running to the benefit of nonparties. Professor Brown's case established that she alone had been the victim of sex discrimination. The only permissible focus of the injunctive relief, therefore, would be on protecting her from further instances of sex discrimination or retaliation. That portion of the injunction which provides that "[t]he defendant is enjoined from discrimination on the basis of sex with respect to ... promotion, salary or other benefits to which the plaintiff may become entitled" provides her with the outer limit of the relief to which she is entitled.[23] That portion of the injunction which provides that the University "is enjoined from discrimination on the basis of sex with respect to the appointment, promotion and tenure of faculty members" is overbroad, and is vacated.

### CONCLUSION

The jury's finding of liability and the district court's order that Boston University reinstate Julia Prewitt Brown as an associate professor with tenure are affirmed. That part of the injunction which ran to the benefit of Boston University faculty other than Professor Brown is vacated, but the portion prohibiting sex discrimination against Professor Brown is affirmed.

### On Petition for Rehearing

Upon consideration of Boston University's petition for rehearing, it is ordered that the petition be denied.

The University makes three arguments in it petition. First it argues that the court

---

**23.** We do not agree with the University that the injunction is overbroad by virtue of protecting Brown from discrimination with respect to promotion, salary or other benefits. Although Brown established only that she was the victim of a discriminatory tenure decision, the district court has "broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been commit-

ted or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *N.L.R.B. v. Express Publishing Co.*, 312 U.S. 426, 435, 61 S.Ct. 693, 699, 85 L.Ed. 930 (1941). Sex discrimination with respect to promotion, salary and other benefits is "of the same type or class as" sex discrimination with respect to tenure.

failed to consider the cumulative effect of four evidentiary errors by the district court, as well as the effect of a ruling by the district court which we stated may have been error, but if so then harmless. Contrary to the University's contention, the court has already considered the collective impact of these rulings and concluded that the University was not prejudiced. Although the opinion did not expressly state that the cumulative impact of the errors would in all likelihood have not affected the jury verdict, we obviously implied this. In each case, the opinion stated essentially that any effect on the jury would be negligible.

■ The University's second argument has to do with whether the district court properly allowed the breach of contract claim to go to the jury. In the majority opinion, we declined to address the University's argument that by removing tenure from the grievance procedure, the collective bargaining agreement not only shielded tenure decisions from being grieved but also from judicial review. We based our refusal to consider the argument upon the University's failure to raise it prior to its motion for Judgment NOV. The University does not now protest our decision on this point. However, it asserts that we improperly failed to address a separate argument, to wit, the argument that Article XI of the Agreement (relied on by Brown and the district court as the basis for a contractual right against sex discrimination) did not create a private contractual right against discrimination, but merely acknowledged the statutory rights of aggrieved faculty to take their claims to appropriate federal and state agencies.

Although the University's petition for rehearing now quotes from the University's appellate briefs in a manner suggesting that, in fact, it did make this argument on appeal, when the quotes are read in context (particularly note 19 in the original brief), they appear to be merely a gloss on the primary argument—that by removing tenure decisions from the grievance procedure, the Agreement had precluded judicial review of tenure decisions—rather than a separate argument. This primary argument, as indicated above, we declined to review because it was not timely raised in the district court.

Upon a second look, we remain doubtful that the University's cursory statement in a footnote in its original brief and its "elaboration" in its reply brief, preserved, as a separate point, the argument that Article XI of the Agreement only referenced statutory discrimination remedies. *See, e.g., Pignons S.A. de Mecanique v. Polaroid Corp.*, 701 F.2d 1, 3 (1st Cir.1983) ("In preparing briefs and arguments, an appellee is entitled to rely on the content of an appellant's brief for the scope of the issues appealed, and appellant generally may not preserve a claim merely by referring to it in a reply brief or at oral argument.").

We further note that this argument was not presented to the district court when the University moved for a directed verdict. The University *did* make the argument earlier, in its pre-trial motion for partial summary judgment, but failed to renew it in its motion for a directed verdict. Instead, in the latter motion, the University substituted an inconsistent argument to the effect that Brown was barred from suing under the Agreement because she had not exhausted the Agreement's grievance procedure. This replacement of an earlier argument with an inconsistent one would suggest to a district judge that the University had abandoned the former. Coupled with the apparent abandonment is the fact that by failing to present the argument in the directed verdict motion, the University lost the right to rely on it in seeking a Judgment NOV. *See* majority op. at 361 n. 20. Under all these circumstances, we disagree that this argument is now properly before us. *See generally* 4 C.J.S., Appeal and Error § 253, at 770 ("a party seeking correction of error must stand or fall on the case which was made in the trial court, and thus it follows that only those objections or grounds of objection which were urged in the trial court, without change and without addition, will be considered on appeal.") *Cf. Hale v. Firestone Tire & Rubber Co.*, 756 F.2d 1322, 1333–34 (8th Cir.1985) (party whose motion in limine is denied must renew objection at trial and renewal of objection on different grounds does not preserve issue for appellate review).

The University's third argument is that this court erred in holding that the University had waived its argument that section 14(a) of the NLRA [1] barred enforcement of

---

1. Section 14(a) provides in part,

 no employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining.

 29 U.S.C. § 164(a).

the Agreement under either state or federal law by not raising it until after the trial.

The University argues that since the district court did not treat the contract claim as a *state* contract claim until after the jury verdict, it had neither reason nor opportunity to raise its section 14(a) defense prior to that time. The problem with this argument is that the University had ample reason and opportunity to raise this defense prior to trial. The University's argument—that enforcement of the Agreement would effectively compel the University to treat individuals defined as supervisors as employees, in violation of section 14(a)—did not depend on the classification of the breach of contract claim as a state law action. As stated in its original brief, the University's argument was that "*any* exercise of federal court jurisdiction to enforce the Agreement relied upon by Brown would be contrary to the injunction of Section 14(a) of the Act." (emphasis in original). Thus, the University's section 14(a) defense was available against enforcement of the Agreement under either state or federal law as soon as it became clear that the University's faculty were supervisors—either in 1980 when the Supreme Court decided *NLRB v. Yeshiva University*, 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980), or at least in 1986 when the NLRB ruled in *Trustees of Boston University*, 281 N.L.R.B. No. 115, that the University's faculty are supervisors. *See* majority op. at 355, 357.

▪ The University also argues that its defense that section 14(a) preempts state law is jurisdictional and therefore cannot be waived. The majority opinion addressed and rejected this argument. However, the University has embellished its argument by asserting that under *International Longshoremen's Association v. Davis*, 476 U.S. 380, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986), preemption under the National Labor Relations Act "is in the nature of a challenge to the Court's power to adjudicate that may be raised at any time."

Despite this gloss on the argument, it remains without merit. In *Davis*, the Court did not hold that all preemption under the NLRA is jurisdictional; it held only that *Garmon* preemption is jurisdictional. *Garmon* preemption derives from *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), in which the Court held that where a dispute involves "activity [that] is argu-

ably subject to § 7 or § 8 of the [National Labor Relations] Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of interference with national policy is to be averted." *Id.* at 245, 79 S.Ct. at 780. The Court explained in *Davis* that *Garmon* preemption "rest[s] on a determination that in enacting the NLRA Congress intended for the Board generally to exercise exclusive jurisdiction in this area." 476 U.S. at 391, 106 S.Ct. at 1912. The Court further explained that "If there is preemption under *Garmon*, then state jurisdiction is extinguished." *Id.* Thus, the Court concluded, *Garmon* preemption cannot be waived and must be addressed whenever it is raised.

The *Davis* Court made clear, however, that its holding is limited to disputes over which Congress intended to give the NLRB exclusive jurisdiction.

> [T]his conclusion [that *Garmon* pre-emption is jurisdictional] derives from congressional intent as delineated in our prior decisions. Thus, our decision today does not apply to pre-emption claims generally but only to those pre-emption claims that go to the State's actual adjudicatory or regulatory power as opposed to the State's substantive laws. The nature of any specific pre-emption claim will depend on congressional intent in enacting the particular pre-emption statute.

476 U.S. at 391 n. 9, 106 S.Ct. at 1912 n. 9. The University's argument is not that the NLRB has exclusive jurisdiction over this dispute. Indeed, since faculty members have been deemed supervisors and not employees, the NLRB plainly would *not* have jurisdiction over disputes between the University and a member of its faculty. The University's argument is simply that enforcement of the Agreement would violate section 14(a). Thus, the argument would at best establish that section 14(a) preempts state substantive law by rendering the Agreement unenforceable; it would not establish that section 14(a) preempts state or federal court jurisdiction. Accordingly, the argument is not jurisdictional and is not appropriately addressed at this late stage of the lawsuit. *See Johnson v. Armored Transport of California, Inc.*, 813 F.2d 1041, 1043–44 (9th Cir.1987) (argument that section 301 of the Labor Management Relations Act preempted state law wrongful discharge claim affects affects only choice of law and not choice of

forum and therefore was subject to waiver); *Reithmiller v. Blue Cross & Blue Shield of Michigan*, 824 F.2d 510, 512 (6th Cir.1987) ("Plaintiff's argument [that state court's jurisdiction was pre-empted by ERISA] reflects a misunderstanding of the distinction between pre-emption of a state's substantive law and pre-emption of a state court's power to adjudicate.").

*Petition Denied.*